2014-1037

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SMARTMETRIC, INC.,

Plaintiff-Appellant,

v.

MASTERCARD INTERNATIONAL, INC.,

and

VISA, INC.,

Defendants-Appellees,

Appeal from the United States District Court for the Central District of California in case no. 11-cv-7126, Judge Michael W. Fitzgerald

---

OPENING BRIEF OF PLAINTIFF-APPELLANT SMARTMETRIC, INC.

---

WAGNER, ANDERSON & BRIGHT, P.C.
Patrick F. Bright, Esq.
3541 Ocean View Blvd.
Glendale, CA 91208
(818)249-9300
pbright@patentattorney.us

*Attorneys for Appellant*
*SmartMetric, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant <u>SmartMetric, Inc.</u> certifies the following:

1. The full name of every party represented by me is:

    SmartMetric, Inc., a Nevada corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    SmartMetric, Inc., a Nevada corporation

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    N/A

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are appearing in this Court are:

    Patrick F. Bright, Esq. of Wagner, Anderson & Bright, P.C.

Dated: December 23, 2013            /s/ Patrick F. Bright_____

Patrick F. Bright
*Attorney for Plaintiff-Appellant*
*SmartMetric, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................vi

STATEMENT OF RELATED CASES ..................................................xi

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES .........................................................1

STATEMENT OF THE CASE ...........................................................4

STATEMENT OF THE FACTS ..........................................................7

SUMMARY OF THE ARGUMENT ..................................................15

ARGUMENT ...............................................................................20

   I.     **STANDARD OF REVIEW**..................................................20

   II.    **THIS COURT SHOULD REVERSE THE *SJOrder's* DENIAL OF SMARTMETRIC'S INFRINGEMENT MSJ, TO GRANT SUMMARY JUDGMENT TO SMARTMETRIC THAT DEFENDANTS' EMVSYSTEMS INFRINGE**...........................21

         A.  **Smartmetric's Evidence, on Smartmetric's MSJ on Infringement was Sufficient to Prima Facie Prove Infringement**..................................................21

         B.  **Gussin's Declarations are Admissible, and are NOT Conclusory**..........................................................22

         C.  **The Cases the *SJOrder* cites, as Showing Gussin's Declarations are "Conclusory", Are All Obviously Inapplicable**..........................................................27

         D.  **Defendants' Declarations were Insufficient to Create a Genuine Issue of Material Fact, Even if Admitted; and Should have Been Excluded, pursuant to Smartmetric's *Evidentiary Objections with Requests to Strike***..............29**

E. <u>The Uncontroverted Evidence Entitles Smartmetric to Summary Judgment that Defendants' EMVsystems Infringe Smartmetric's Asserted Claims</u>......................32

III. **THIS SAME LAW AND EVIDENCE—WHICH REQUIRES GRANTING SMARTMETRIC'S INFRINGEMENT MSJ— REQUIRES <u>REVERSING</u> THE *SJOrder's* GRANT OF SUMMARY JUDGMENT OF NON-INFRINGEMENT TO DEFENDANTS**......32

A. <u>Granting Defendants' MSJ Non-Infringement was Error of Law, Contary to Rule 56(a) and Case Law</u>...................32

B. <u>Regarding Defendants' MSJ on Non-Infringement, All Evidence was Required to be Construed in the Light Most Favorable to Non-Movant Smartmetric; the *SJOrder* Committed Error of Law by Construing All Evidence AGAINST Smartmetric, in Favor of Defendants</u>...........33

C. <u>Defendants' Documents and Admissions, and Gussin's Declarations, Even Viewed (in error) in the Light Most Favorable to Defendants, Created a Genuine Issue of Material Fact Regarding Infringement/Non-Infringement, which Made it Error of Law to Grant Defendants' MSJ of Non-Infringement</u>.................................................34

D. <u>The *SJOrder* Erred—in Granting Defendants' MSJ, and Denying Smartmetric MSJ—by Ruling Defendants Did Not Infringe, on the Basis that Defendants' Lacked Control over Defendants' EMVsystems</u>.................................34

E. <u>For 3 Separate Reasons, the *SJOrder* Erred, by Granting SJ of Non-Infringement to Defendants on the Basis that Defendants' EMVsystems Did Not Contain "Local Access Numbers"/"Database of Local Access Numbers"</u>................36

*1. Defendants did <u>Not Deny</u> that Defendants' EMVsystems have Default Access Numbers, Gussin attests Defendants' EMVsystems Have Default Access Numbers, and Smartmetric's*

*Asserted Claims Require "One Of" "Local Access Number" and "Default Access Number", NOT Both*.....................................................36

2. *The SJOrder's Grant of SJ of Non-infringement to Defendants is Based on Error of Law by Using an Erroneous Definition of "Local Access Number"*...........................................37

3. *Even Using the Erroneous Definition of "Local Access Number", Defendants' Documents and Admissions, Plus Gussin's Declarations, Established Defendants' EMVsystems include "Local Access Numbers"/ Databases of Those, Precluding Grant of Summary Judgment of Non-infringement to Defendants for Lack of "Local Access Numbers"*...................................37

F. The *SJOrder* Erred in Failing to Sustain Smartmetric's Valid *Evidentiary Objections/Requests to Strike* the Declarations of Defendants' Declarants........................38

G. The *SJOrder's* Conclusion of Non-Infringement is Error of Law.......................................................38

IV. THIS COURT SHOULD REVERSE THE *SJOrder* AS BEING BASED ON ERRONEOUS DEFINITIONS OF THE CLAIM TERMS "LOCAL ACCESS NUMBER"/DATABASE OF THOSE; AND SHOULD DEFINE THOSE TERMS AS SMARTMETRIC REQUESTED.......................................................39

V. THE *SJOrder's* GRANT OF DEFENDANTS' NON-INFRINGEMENT MSJ, AND DENIAL OF SMARTMETRIC'S INFRINGEMENT MSJ, CANNOT PROPERLY BE AFFIRMED ON THE BASIS THAT SMARTMETRIC WAS SLIGHTLY LATE IN SERVING GUSSIN'S EXPERT REPORT...........................41

A. <u>Text of FRCP Rule 37(c)(1)</u>...................................42

B. <u>Defendants Prevented Smartmetric from Being Able to
Serve Gussin's Expert Report on Time, by Defendants' 7
Month Delay In Producing Defendants' Confidential
Documents, that Showed How Defendants' EMVsystems
Function</u>................................................................43

C. <u>The Short Delay in Serving Gussin's Report was
Harmless</u>................................................................44

D. <u>Even Where a Failure to Designate is NOT Substantially
Justified, and is NOT Harmless, Controlling Case Law
Requires DCs to Utilize Lesser Sanctions (such as
Continuance) instead of Exclusion, if Excluding the Expert
Would be Tantamount to Dismissal of Plaintiff's case, as it
Would be Here</u>.......................................................45

VI.   THIS COURT SHOULD GRANT SUMMARY ADJUDICATION
THAT IF INFRINGEMENT IS PROVEN, THE PROPER
MEASURE OF DAMAGES IN THIS CASE IS A <u>PORTION OF
THE COST SAVINGS</u> DEFENDANTS OBTAINED FROM USE OF
THE INFRINGING EMVSYSTEMS.....................................47

VII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT.........48

# TABLE OF AUTHORITIES

## CASES

*Aikens v. Ingram,*
    652 F.3d 495 (4th Cir. 2011)............................................................46

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
    692 F.3d 1301 (Fed. Cir. 2012)......................................................35

*Ambrosini v. Labarraque,*
    966 F.3d 1464 (DC Cir. 1992).........................................................34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)...............20, 33

*Aspex Eyewear, Inc. v. Concepts in Optics, Inc.,*
    111 Fed. Appx. 582 (Fed. Cir. 2004).............................................28

*Balint v. Carson City,*
    180 F.3d 1047 (9th Cir. 1999)........................................................33

*Becton Dickinson & co. v. Tyco Healthcare Group, LP,*
    616 F.3d 1249 (Fed. Cir. 2010).....................................................27

*Bieghler v. Kleppe,*
    633 F.2d 531 (9th Cir. 1980).........................................................34

*Builders Concrete v/ Bremerton Concrete Prods. Co.,*
    757 F.2d 255 (Fed. Cir. 1985)....................................................29, 39

*Bullock v. Daimler Trucks North America, LLC,*
    2010 WL 4259793 (D. Colo. 2010).................................................25

*Bulthius v. Rexall Corp.,*
    759 F.2d 1315 (9th Cir. 1985)........................................................34

*Carotek, Inc. v. Kobayashi Ventures, LLC,*
    875 F.Supp.2d 313 (S.D.N.Y. 2012)...........................................24, 25

*Centillion Data Systems, LLC v. Qwest Comm'ns Int'l, Inc.,*
    631 F.3d 1279 (Fed. Cir. 2011)......................................................35

*Cody v. Mello,*
    59 F.3d 12 (2nd Cir. 1995)...............................................46

*Colleton Prepatory Acad., Inc. v. Hoover Universal,*
    616 F.3d 413 (4th Cir. S.C. 2010)...................................47

*Computer Docking Station Corp. v. Dell, Inc.,*
    519 F.3d 1366 (Fed. Cir. 2008).............................20, 21

*Cool Fuel, Inc. v. Connant,*
    685 F.2d 309 (9th Cir. 1982)...................................6, 48

*Cross Med. Prods. V. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005)......................................36

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) (en banc)...............21, 39

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004)......................................28

*Eitel v. McCool,*
    782 F.2d 1470 (9th Cir. 1986)......................................47

*GE v. Joiner,*
    522 U.S. 136 (U.S. 1997).............................................26

*Hanna v. Ishee,*
    694 F.3d 596 (6th Cir. 2012).......................................23

*Hanson v. Alpine Valley Ski Area, Inc.,*
    718 F.2d 1075 (Fed. Cir. 1983)...............................47, 48

*Innogenetic, N.V. v. Abbot Labs.,*
    512 F.3d 1363 (Fed. Cir. 2008)....................................28

*Innovention Toys, LLC v. MGA Entertainment, Inc.,*
    637 F.3d 1314 (Fed. Cir. 2011)....................................33

*Innova/PureWater, Inc. v. Safari Water Filtration Sys., Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004)....................................40

*Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
    589 F.3d 1179 (Fed. Cir. 2009)............................................................27

*Lesser v. Camp Wildwood*,
    282 F.Supp. 2d 139 (S.D.N.Y. 2003)....................................................24

*Lockwood v. American Airlines*,
    107 F.3d 1565 (Fed. Cir. 1997).........................................................27

*Manpower, Inc. v. Ins. Co. of Pa.*,
    732 F.3d 796 (7th Cir. Wis. 2013)..............................2o, 24, 25, 26

*Monsanto Co. v. McFarling*,
    488 F.3d 973.............................................................................47, 48

*Motionless Keyboard co. v. Microsoft Corp.*,
    486 F.3d 1376 (Fed. Cir. 2007)..........................................................27

*Northbrook NY, LLC v. Lewis & Clinch, Inc.*,
    2012 WL 4338740 (N.D.NY 2012)....................................................25

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)..........................................................36

*Olsen v. Idaho State Bd. Of Med.*,
    363 F.3d 916 (9th Cir. 2004)............................................................33

*Ormco Corp v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007)..........................................................20

*Paointhara v. INS*,
    708 F.2d 472 (9th Cir. 1983)............................................................23

*Powell v. Home Depot U.S.A. Inc.*,
    663 F.2d 1221 (Fed. Cir. 2011).....................................................49, 50

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007)..........................................................23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc).........................40, 41, 51

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013)..................................20, 21, 33, 34, 39

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013)..........................................20, 26

*Schumer v. Lab. Computer Sys.*,
    308 F.3d 1304 (fed. Cir. 2002)..............................................29

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008)...............................................28

*SmartMetric Inc. v. Am. Express Co.*,
    476 F. App'x 742 (Fed. Cir. Apr. 11, 2012).......................................xi

*Stamps.com Inc. v. Endicia, Inc.*,
    437 Fed. Appx. 897 (Fed. Cir. 2011).........................................28

*Sunovion Pharms., Inc. v. TEVA Pharms., USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013).........................................39, 40

*Tokai Corp. v. Easton Enters.*,
    632 F.3d 1358 (Fed. Cir. 2011)............................................46

*R&R Sailing v. Ins. Co. of Pa.*,
    673 F.3d 1240 (9th Cir. 2012)..........................................45, 46

*Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*,
    2011 WL 5976076 (E.D.N.Y. Nov. 18, 2011)...............................24

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................40

*Westchester Fire Ins. Co. v. Mendez*,
    585 F.2d 1183 (9th Cir. 2009)............................................47

*Wilson v. Volkswagen of Am., Inc.*,
    561 F.3d 494 (4th Cir. 1997)............................................46

*02 Micro Int'l, Ltd. v. Monolithic Power Sys. Inc.*
    467 F.3d 1355 (Fed. Cir. 2006).........................................20

## STATUTES

28 U.S.C. §1338(a) ......................................................................1

28 U.S.C. §1295(a) ......................................................................1

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. Pro. 3(d) ..................................................................1

Fed. R. App. Pro. 4(a) ..................................................................1

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 702.............................................................23, 24, 25, 26 30

Fed. R. Evid. 801(d)................................................................2, 23, 34

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 30(b)(6)...........................................................*passim*

Fed. R. Civ. P. 37(c)(1)..........................................4, 19, 42, 43, 44, 45, 46

Fed. R. Civ. P. 56...................................................................*passim*

## STATEMENT OF RELATED CASES

The following statement is made pursuant to Federal Circuit Rule 47.5:

This appeal is the only appeal from the civil action below. Plaintiff-Appellant SmartMetric, Inc. (hereinafter "Appellant") is not aware of any other appeal from the same civil action or proceeding in the DC that was before this, or any other appellate court.

However, Appellant had earlier sued Visa and MasterCard for infringing the patent-in-suit here, by selling systems other than the EMVsystems at issue here. *See SmartMetric Inc. v. Am. Express Co.*, 476 F. App'x 742 (Fed. Cir. Apr. 11, 2012).

## JURISDICTIONAL STATEMENT

(1)    The District Court ("DC") (Judge Fitzgerald, CD CA), had subject-matter jurisdiction over this patent infringement suit under 28 U.S.C. §1338(a).

(2)    This Court has jurisdiction over the DC's final judgment of dismissal, and the DC's summary judgment order, under 28 U.S.C. §1295(a).

(3)    This appeal appeals:

(A) Order ("*SJOrder*" hereafter), entered 10/2/13(A03-A017), "Order Granting Defendants' …Motion for Summary Judgment as to Non-Infringement…; and

(B) the final Judgment against Smartmetric, entered 10/16/13(A01-A02), dismissing Defendants' counterclaims, without prejudice, at Defendants' request.

(4)    Pursuant to Rules 3(d) and 4(a) of the Federal Rules of Appellate Procedure, Smartmetric, on 10/17/13, timely appealed(A04037-A04063) to this Circuit.

## STATEMENT OF THE ISSUES

The issues on this appeal are:

(1) Should this Court **reverse** that portion of the *SJOrder*, which **denied** Smartmetric's motion for summary judgment ("MSJ") of infringement; and instead **grant** summary judgment to Smartmetric, that Defendants' EMV systems/methods ("EMVsystems" hereafter) literally infringe Smartmetric's asserted patent claims (the "asserted claims"), because: (A) **Defendants' documents** show Defendants' EMVsystems include all six elements in Smartmetric's asserted claims; (B) Defendants' FRCP Rule 30(b)(6) **witnesses made key admissions**, including admitting control of all **claimed** elements of Defendants' EMVsystems; (C) the **Declarations**(A01253-A01403, A02739-A02850, A03450-A03457) of Smartmetric's infringement expert, electrical engineer **Edward Gussin** ("Gussin"), gave Gussin's expert opinion that Defendants' EMVsystems include all six

elements in the asserted claims, and therefore infringe, based on Defendants' own documents and deposition admissions; and (D) all evidence (A)-(C) was **uncontroverted**, because **Defendants' witnesses did not claim to have reviewed Defendants' documents that Gussin's Declarations relied on as showing Defendants' infringement, did not contest what Gussin said, and did not file any Declarations, or any other evidence, rebutting Gussin's analysis.**

(2) Whether this Court should reverse that portion of the *SJOrder*, which **granted summary judgment of non-infringement to Defendants**, because:

a. the *SJOrder* erroneously concluded there was no genuine issue of material fact regarding non-infringement, only by (1) **ignoring Defendants' own documents**, containing Defendants' admissions, admissible per FRE Rule 801(d), which showed Defendants' EMVsystems had all elements in Smartmetric's asserted claims, (2) **ignoring admissions** of Defendants' witnesses, including admission Defendants control all claimed elements of, and benefit financially from Defendants' EMVsystems, and (3) **ignoring Gussin's declarations**(A01253-A01403, A02739-A02850, A03450-A03457), which were admissible, and explained why, based on Defendants' documents and admissions, Defendants' EMVsystems include all 6 elements of the asserted claims;

b. grant of summary judgment of non-infringement **to Defendants** constituted **error of law**, because Defendants' documents, plus admissions of Defendants' witnesses, plus Gussin's Declarations, created a **genuine dispute of material fact**, precluding granting Defendants' MSJ.

c. grant of Defendants' non-infringement MSJ violated controlling FRCP Rule 56 case law, which requires viewing **all evidence in the light most favorable to nonmovant** (there, Smartmetric).

d. granting Defendants' non-infringement MSJ (and denying Smartmetric's infringement MSJ) was error of law, because based on DC erroneously failing to sustain Smartmetric's valid *Evidentiary Objections/Requests to Strike*(A02536-

A02539 and A03434-A03436) the declarations of Defendants' declarants Merschen, Aabye, and Grimes(A01869-A01903; A01523-A01531; A01532-A01540), which were **inadmissible** for multiple reasons, but which the DC erroneously admitted/relied on.

e. it was error of law to grant Defendants' non-infringement MSJ (and to deny Smartmetric's infringement MSJ) on the basis that Defendants **do not make** EMV credit/debit cards, or EMV card readers;  Defendants' witnesses admitted Defendants **control** all claimed elements of Defendants' EMVsystems-- including controlling the specifications for the EMV cards (cards bearingVISA/MasterCard names/logos), for the EMV card readers--and Defendants' witnesses admitted Defendants **benefit** from the large cost savings obtained by using Defendants' EMVsystems; and **control** **plus** **benefit** is all this Court's decisions require to infringe.

f. it was error of law/clear error of fact, **for 3 reasons**, to grant Defendants' non-infringement MSJ (and to deny Smartmetrics' infringement MSJ) on the basis that Defendants' EMVsystems do not have a "local access number"/database of local access numbers: (1)  Smartmetric's asserted claims call for **("one of")** a local access number, **or** a default access number, not both; Gussin's declarations, based on Defendants' documents, attested Defendants' EMVsystems have a default access number; and Defendants did **not** deny this; (2) the DC's definition of "local access number"/"database of local access numbers," was error of law, and using the erroneous definitions, the DC found **no** "local access number" and **no** "database of local access numbers" in Defendants' EMVsystems; and (3) even using DC's **erroneous definitions**, Defendants' documents, plus Gussin's Declarations, established that Defendants' EMVsystems have a "local access number"/database of local access numbers (and also would have those items, under the **correct** definitions of those terms Smartmetric proposed).

3

(4) Whether the *SJOrder*'s "alternate ground", of could-have-excluded-Gussin-because-Gussin's-expert-report-was-served-late, would have been reversible error, violating FRCP Rule 37(c)(1), if the DC had granted Defendants' MSJ non-infringement, and denied Smartmetric's MSJ infringement, on that basis, when Defendants caused the slight lateness in serving Gussin's expert report by, for 7 months, delaying production of Defendants' key confidential documents showing how Defendants' EMVsystems worked, until after the expert report service date set by the DC's scheduling order; the late service was harmless because still months before trial; Defendants deposed Gussin; and Smartmetric continued Smartmetric's MSJ to allow Defendants to calendar Defendants' MSJs for hearing, with Smartmetric's MSJ.

(5) Whether, as Smartmetric cross-requested, Smartmetric should have been granted summary adjudication that the proper measure of infringement damages here is a **portion of the cost savings** obtained from Defendants' EMVsystems, an issue of law based on uncontroverted facts.

(6) Whether the DC's final Judgment(A01-02) should be **reversed**, because the DC should have granted Smartmetric's infringement MSJ, and denied Defendants' non-infringement MSJ.

## STATEMENT OF THE CASE

On 8/29/11, Smartmetric filed suit against Defendants(A063; A065-A072), in District Court, CDCA, alleging Defendants infringe Smartmetric's U.S. patent 6,792,464("'464 Patent"), "by selling, offering to sell and using contact and contact/contactless credit card system that use datacards that, when inserted into a data card reader, help to establish connection to a network."(A063). Defendants' documents refer to Defendants' datacard processing systems as "EMVsystems". "EMV system" is Defendants' acronym for Europay MasterCard Visa datacard processing systems.(A01881/A03451).

Defendants answered on 5/23/12(A0101-A0129), denying infringement, and

4

counter-claiming for non-infringement and invalidity. (*Id.*).

On 10/3/12, the DC issued its claim construction order(A0502-A0515). That order **erroneously defined** the claim term "local access number" as "a number that indicates a designated or selected network service provider specific to the locale of the user at the time the user attempts access"; rejecting Smartmetric's **correct definition** of "local access number"(A0291-A0293), required by the intrinsic evidence, namely, "an access number that is either an access number with corresponding location information or a network service provider." The DC also erroneously defined "data base of local access numbers," rejecting Smartmetric's proper proposed definition, which was "a database with a list of access numbers with corresponding location information or network service providers with corresponding location information"(A0512-A0514).

On 3/26/13, Smartmetric moved for partial summary judgment ("MSJ"), in Smartmetric's favor, that Defendants' EMVsystems **infringe** Smartmetric's asserted claims, and moved for partial summary judgment dismissing, with prejudice, Defendants' **affirmative defenses of obviousness and anticipation** (A01185-A01403). Smartmetric's MSJ included Gussin's declaration(A01253-A01403), attesting Defendants' EMVsystems include all elements in Smartmetric's asserted claims.

On 5/5/13, Defendants filed 3 MSJs: (1) MSJ for **alleged non-infringement** (A01489-A01971): MSJ for **alleged invalidity** of the asserted claims(A01972-A02532), and MSJ on **damages**(A01404-A01488).

On 5/24/13, Smartmetric filed Smartmetric's three Oppositions(A02533-A03254), to Defendants' three MSJs; and Defendants filed Defendants' Opposition (A03255-A03415) to Smartmetric's infringement MSJ. As allowed by FRCP Rule 56(f) and the *Cool Fuel, Inc. v. Connant*, 685 F.2d 309 (9th Cir.1982) line of cases, Smartmetric's Opposition(A02948-A03254) to Defendants' damages MSJ cross-requested summary adjudication in Smartmetric's favor, that the applicable

measure of damages, in this case, is a **portion of Defendants' cost savings** obtained with Defendants' EMVsystems, if infringement is proven. FRCP Rule 56(f)(1), and *Cool Fuel*, allow the Court, on notice, to grant summary judgment/adjudication to the **non-movant** (Smartmetric), where controlling law, and the uncontroverted evidence, establish that non-movant is entitled to this relief.

On 6/10/13, Smartmetric filed Smartmetric's Reply(A03416-A03471) to Defendants' Opposition to Smartmetric's MSJ for infringement. Defendants filed Defendants' three Replies(A03472-A03959) to Smartmetric's three Oppositions, to Defendants' three MSJs.

Defendants also objected to, and moved to strike Smartmetric Gussin's reply declaration(A03956-A03959). On 6/24/13, the DC held a status conference to discuss Defendants' objections to Smartmetric's late-filed expert reports and declarations; did NOT strike the expert reports(A03973-A04009); and continued the MSJ hearings.

On 9/25/13, the DC heard Smartmetric's MSJ and Defendants' three MSJ's. The DC distributed a tentative ruling against Smartmetric, immediately before the hearing.

On 10/2/13, the DC issued its *SJOrder*(A04013-A04027), here appealed, denying Smartmetric's infringement MSJ, and granting Defendants' non-infringement MSJ.

On 10/16/13, the DC entered a final Judgment(A04035-A04036) here appealed, against Smartmetric. At Defendants' request, that Judgment dismissed Defendants' other counterclaims, without prejudice.

Smartmetric here appeals the *SJOrder*, and the final Judgment.

## STATEMENT OF THE FACTS

Smartmetric owns the '464 patent(A049-A062). The '464 patent contains two independent claims--claim 1 and claim 14. Claim 1 requires 6 elements:

(1) a computer system for allowing a user to automatically access one of a plurality of network service providers which require information specific to the user and/or the network service provider to be accessed;

(2) a data card which contains the information specific to the user and/or the network service provider to be accessed;

(3) a data card reader adapted to access at least part of the information contained on the data card when the data card is in communication with the reader;

(4) a data processor in communication with the data card reader and adapted to be connected to a network; and

(5) an application program resident on the data processor configured to automatically retrieve at least part of the information contained on the data card when the data card is in communication with the data card reader and to use that information to gain access to one of the plurality of network service providers via the network **by using "one of" [not both]** (i) a default access number indicating a designated network service provider and (ii) a local access number from a database containing a list of access numbers or the plurality of network service providers along with corresponding location information for each access number in the list.

(6) The application program is immediately triggered upon insertion of the data card into the data card reader.

Defendants' MSJ only denied having a "local access number" in Defendants' EMVsystems, plus denied Defendants had "control" of their EMVsystems.

In Gussin's 5/24/13 declaration, at ¶¶6-10(A02739-A02850), opposing Defendants' non-infringement MSJ, Gussin identifies Defendants' own documents, produced by Defendants in this case, which show that Defendants' EMVsystems contain all 6 elements in Smartmetric's independent claims 1 and 14.

The *SJOrder*(A03-A017), concludes, in error, that Smartmetric did not prove that Defendants' EMVsystems include local access numbers, and a database of such numbers.  So concluding is error as contrary to Gussin's Declaration (A02739-A02850), ¶10 and ¶19 (A02743-A02744; A02748-A02749), which attests that Defendants' own documents show Defendants' EMVsystems contain both local access numbers, and a database of local access numbers.  Gussin ¶10 (A02743-A02744) states:

" 10. The fifth element of claim 1 of the '464 patent is (5) "an application program resident on the data processor, said application program being configured to automatically retrieve at least part of the information contained on the data card when the data card is in communication with said data card reader and to use said information to gain access to one of the plurality of network service providers via the network by using one of a default access number indicating a designated network service provider and a local access number from a database containing a list of access numbers for the plurality network service providers along with corresponding location information for each access number in the list[.]" The following documents show this element is present in the accused Visa and MasterCard EMVsystems: VISA documents VIS-SM000017639 is a Transactional Flow Table, showing a summary of the transaction processing steps. Step 1, The chip card is inserted into the chip reading device. Step 2, Application Selection, The device determines the applications supported by the card. Step 10, Online Processing, If requested, the device will send the transaction online. The device sends the ARQC, the original data element used by the chip . . . online to the acquirer; VIS-SM00017378, VIS-SM00017379 VisaNet has enhanced Routing and Stand-in Processing Services. During authorization processing, VisaNet considers the results of the card and device interaction to make routing decision. Table 7-3 VSDC Routing and

STIP Options shows a column indicating Route to Issuer Default conditions. MasterCard document MII 00004867 shows a Functional flow chart showing card, terminal, network and issuer. The terminal (data processor) is shown connected to the card reader and connected to a network. MII 00008367 and MII 00006854 shows the IFD should have a pictogram near the card slot indicating how to insert the card into the IC reader. As soon as the card is inserted into the reader, the message "Please Wait" should be displayed to reassure the cardholder that the transaction is being processed. MII 00014949 and MII 00014950 shows The Authorization Platform provides the following: Backup to primary (default) routing and authorizing paths. MII 00014951 and MII 00086908 shows the network routes transactions via multiple paths. Stand-In processing uses issuer-established parameters to process authorization transactions. MII 00014980 shows the MasterCard Network, unable to route the authorization request to the online issuer, routes it to Stand-In processing. MII 00096113 shows Acquirers may default route to the Interchange System any Transaction not belonging to their proprietary network. Acquirers who do not default route must update their financial institution table (FIT). Acquirers who do not default route to the Interchange System must use the FIT for routing.

Gussin's Declaration(A02748-A02749) states:

19. Neither Dr. Merschen, Mr. Aabye, or Dr. Grimes in their non-infringement declarations filed May 5, 2013 addresses, or otherwise refutes, any of the infringement assertions made in my declaration dated March 9, 2013, nor do they disagree with my inferences from the Visa and MasterCard documents that I cited. Although the Visa and MasterCard documents do not specifically show a database containing local access numbers, it can be reasonably inferred to exist by one skilled in the art from

the information provided in the documents, and the deposition testimony of the Visa and MasterCard experts. The stand-in processing as described in the documents clearly route transaction authorization requests through the Visa and MasterCard networks to processing assets other than the default processor. This routing requires a list of routing addresses which must be stored in a database within the system in order for the router to know where to route the requests to. It can also reasonably inferred that the router would route to the closest available asset. Transactions originating in the US for instance would be routed for processing within the US, to one of VISA's many geographically separate data processing centers, preferably to a center geographically close to the POS, ATM or other card-initiated transaction, and card reader used, as opposed to say Europe. Mr. Aabye (VISA's Rule 30(b)(6) witness, states in his deposition of May 3, 2013 on page 93 that there is a plurality of geographically separate VISA data processing centers in the United States."

Additionally, the **SJOrder**(A012-A013), errs in concluding that Defendants do not "… **control** the system as a whole and obtain benefit from it." Rather Defendants' witnesses **admitted that Defendants control every element** of, and **Defendants benefit financially** from the EMVsystems. Gussin's declaration (A02749-A02751), cites to the testimony of Defendants' expert Merschen, who testified that **MasterCard controls all aspects of MasterCard's EMV system**, and cites to the testimony of VISA's witness Aabye, who testified that VISA controls all aspects of VISA's EMV system:

20. Dr. Merschen, in his May 5, 2013, declaration on the infringement issue, at paragraph 49, states that "MasterCard also sets standards to ensure global interoperability between MasterCard-branded cards issued by every issuer and MasterCard-compatible terminals integrated into merchant locations by

every acquirer around the world." Dr. Merschen also states in his deposition
of April 10, 2013 on page 198 that MasterCard defines procedures, message
content and flow for authorization clearly and settlement of payment card
transactions, and that MasaterCard also sets standards for card readers.

21. In his report dated January 28, 2013, at pages 6 and 7, Dr. Merschen
states that: "Mastercard sets standards for certain physical and technical
aspects of cards and teminals across the payment system to ensure global
interoperability between Mastercard-branded cards issued by every issuer
and Mastercard-branded terminals integrated into merchant locations by
every acquirer around the world. Mastercard also defines the procedures,
message content, and flow for authorization, clearing and settlement of
payment card transactions.  Authorization refers to the process by which a
transaction is routed from the merchant to the issuer for approval, and by
which a decision whether or not to approve the transaction is made by and
routed from the issuer back to the merchant for proper action.  Clearing
refers to the exchange of financial transaction information between issuers
and acquirers after a transaction has been successfully conducted at the point
of sale.  Settlement refers to facilitating the exchange of funds between he
different parties.  Additionally, MasterCard provides the physical network
connections and systems to transmit and process authorization and
settlement messages between acquirer banks and issuer banks." Mr. Aabye
said, at page 95 of his deposition, that the acquirer and VISA dictate which
data processing location carries out a transaction. It follows that the
merchant/acquirer information for a given transaction act as a local access
number. Mastercard's 10-K for the year ended 12/31/2012 states, at page 7,
that: "Transactions that require fast, reliable processing, such as those
submitted using a contactless card or device at a toll booth, can use the

11

network distributed processing structure, ensuring they are processed close to where the transaction occurred."

22. In other words, Mastercard dictates and controls every aspect of its EMV system, including the data that must be on each card, the reading capability of each reader, the program that controls card/reader/network interaction, the network that provides services to merchant/cardholder/data processor, the geographic data processing locations and cardholders served by each such location, and the networks linked to each such location, including but not limited to stand-in processing networks.

23. Mr. Aabye, in his declaration on the infringement issue, filed May 5, 2013, at paragraph 4, states that "To provide a secure and global transaction process, Visa establishes specifications and regulations that govern certain physical and technical aspects of payment cards and terminals. These Visa specifications ensure interoperability among Visa-branded cards and payment terminals." Both MasterCard and Visa specify and control how the payment systems operate, including how the merchant terminals send authorization requests to the MasterCard and Visa systems.

24. In the Defendants' Motion for Summary Judgment of Non-Infringement filed May 5, 2013, at pages 19 and 20, MasterCard and Visa state that "To be liable for direct infringement, a party must commit all the acts necessary to infringe the patent, either personally or vicariously. For a method claim, direct infringement "means the accused infringer must perform all the steps of the claimed method, either personally or through another acting under his direction or control."" The MasterCard and Visa experts, in their declarations and testimony cited above in paragraph 21, admit that this liability as described in the motion exists through the specification of standards for operability, including the operation of the merchant terminals."

As MasterCard's Rule 30(b)(6) witness-most-knowledgeable on infringement (A02674-A02677), Merschen confirms (as stated in Merschen's expert witness report), that MasterCard sets **standards** for MasterCard's EMV system, and that **an EMV card can only carry the "MasterCard" logo, if that card complies with all MasterCard's standards**:

"Q: Let's go back to your report, Exhibit 100, Doctor, page 6.

A. Yes. Go on.

Q. There's a paragraph that begins at the bottom of page 6 and continues to the top of page 7. This paragraph describes what MasterCard's role is in the EMV system; correct?

A. Correct.

Q. It accurately describes MasterCard's role in the EMVs, does it not?

A. Table does.

Q. It says, among other things, that **MasterCard defines procedures message content and flow for authorization clearly [sic: clearing] and settlement of payment card transactions; right**?

A. **Yes**.

Q. It says that **Mastercard sets standards** for certain physical and technical aspects of cards, do you see that?

A. Yes.

Q. The cards we're talking about are EMV cards; right?

A. That is correct.

Q. **MasterCard also sets standards** for certain technical, meaning card readers; right?

A. That is correct.

Q. And the reason MasterCard sets these **standards**, you state, is to ensure global interoperability; right?

A. That is correct.

13

Q. So that any acquirer who deviates from these **standards** will not be practicing the MasterCard EMV system as you describe it here; correct?

[**emphasis** added, objections omitted]

THE WITNESS: **The cardholder, the issuer, the merchant, the acquirer need to comply with these standards.**

Q. So if I have an EMV card and **it says MasterCard on it**, I can assume that that card has been—**conforms to the standards** you've set forth here on pages six and seven of Exhibit 100; right?

[**emphasis** added, objection omitted]

THE WITNESS: **This card will have been issued by a MasterCard issuer. And as issuer, as a contractual part [sic: party] to MasterCard, will have had to make sure that the card you have been issued complies with MasterCard's requirements, yes.**

Q. And only if cards so issued **meet the standards** you talk about here on pages six and seven, can the issuer put the masterCard logo on the card; right?

A. **That is correct.**

Q. So if the logo is on the card, that means that the **card conforms to the standards** you've set forth here on pages six and seven; right.

[**emphasis** added, objection omitted]

Q. Go ahead?

A. **If the issuer has complied with the rules, yes.**

Q. Now, on page 7, the first full paragraph you have there talks about things MasterCard doesn't do like they don't make cards or issue payment cards; right?

A. Right.

Q. When you say they don't make them, you mean they don't manufacture the actual card; right?

A. They don't manufacture, they don't sell, they don't distribute.

14

Q. **But they do say what has to be on the card to conform to MasterCard's standards; correct**?

A. **They issued specifications that these cards have to comply with, yes**."

Smartmetric filed this testimony in Smartmetric's Opposition(A2533-A02850.) to Defendants' MSJ on non-infringement.

Both Visa's and Mastercard's Rule 30(b)(6) witnesses admitted, in deposition, that Defendants **benefit** from Defendants' EMVsystems, by saving billions of dollars in fraud losses, as compared to the existing magnetic stripe cards. VISA's Rule 30(b)(6) witness, Ericksen(A03236-A03254), and MasterCard's Rule 30(b)(6) witness, Balfany(A03191-A03234), so testified. These large cost savings obtained by use of Defendants' EMVsystems are shown in Visa's documents(A03139-A03189) and in MasterCard's documents(A03111-A03138).

## SUMMARY OF THE ARGUMENT

The *SJOrder* is contrary to the requirements of FRCP Rule 56(a) and controlling Rule 56 Federal Circuit and US Supreme Court case law:

First, it was reversible **error of law**, violating Rule 56(a) and controlling case law, that the *SJOrder* denied Smartmetric's infringement MSJ. Smartmetric's evidence--(1) Defendants' own documents that showed Defendants' EMVsystems include each element claimed in Smartmetric's asserted claims, plus (2) admissions in deposition of Defendants' Rule 30 (b)(6) witnesses, plus (3) Gussin's Declarations(A01253-A01403; A02739-A02850; and A03450-A03459) proved Defendants' EMVsystems literally infringe Smartmetric's asserted claims. (Briefed II.A, infra).

That evidence was **uncontroverted.** Defendants' declarants did NOT rebut Defendants' own documents, Defendants' deposition admissions, or Gussin's Declarations. (Briefed at II.D, infra)  Defendants' Declarants Merschen, Aabye and Grimes **do NOT claim to have examined Defendants' documents**, which

15

Gussin's Declaration identified by Bates production number, and which Gussin attests show that Defendants' EMVsystems include all elements in Smartmetric's asserted claims. Defendants' Declarants **do NOT deny** that Defendants' documents, which Gussin identified/relied on, show Defendants' EMVsystems include these elements. Defendants' Declarants are **silent** about Gussin's Declarations, not addressing Gussin's analysis or conclusions at all. (Briefed II.D, E infra)

Gussin's Declarations were admissible. Gussin was qualified to testify as an expert, using sound methodology in analyzing and relying on Defendants' documents produced in this litigation, and on Defendants' deposition admissions, to determine whether Defendants' EMVsystems include all elements in Smartmetric's asserted claims. The *SJOrder* erred by refusing to credit Gussin's Declarations, ruling they were "conclusory". Where an expert is qualified, and his methodology is sound, his opinions are admissible, whether or not the judge agrees with them. (Briefed II.B,C infra).

**This Court should reverse the *SJOrder*'s denial of Smartmetric's MSJ infringement, and should grant summary judgment to Smartmetric that Defendants' EMVsystems infringe Smartmetric's asserted claims**. (Briefed II.A-E, infra).

Second, for multiple reasons, it was reversible **error of law**, violating Rule 56(a) and controlling case law, that the *SJOrder* granted Defendants' MSJ of non-infringement. Defendants' evidence was **NOT uncontroverted**. Defendants' documents and admissions, plus Gussin's Declarations, created, **at a minimum,** a **genuine issue of material fact, precluding granting Defendants' non-infringement MSJ**. Controlling Rule 56 case law requires all evidence must be construed in favor of non-movant, on summary judgment. Regarding Defendants' MSJ, Smartmetric was the non-movant. The *SJOrder* erred by failing to construe the evidence in Smartmetric's favor on MSJ non-infringement. **This Court should**

**reverse the DC's grant of Defendants' MSJ of non-infringement**. (Briefed III, infra)

The *SJOrder*'s grant of SJ of non-infringement to Defendants, and denial of SJ of infringement to Smartmetric, based on Defendants' lack of "control", is error of law, and clear error of fact. Controlling Federal Circuit case law holds that a Defendant need not manufacture or sell all claimed elements of an otherwise infringing system, if Defendant **controls**, and **benefits** from, here, the EMVsystems. Defendants' witnesses and documents **admitted** that Defendants control, and benefit from, Defendants' EMVsystems. The conclusion of the *SJOrder*(A012-A013) that VISA and Mastercard do not prescribe, and control every element of the asserted claims, particularly the data cards and data card readers called for in the claims, is **contrary to the uncontroverted admissions of Defendants' witnesses**. The *SJOrder* ignores the Gussin declaration, (A02749-A02751), reporting the admissions of VISA and Mastercard Rule 30(b)(6) witnesses Aabye and Merschen, that Defendants control the structure and function of every claimed element of Defendants' EMVsystems, including controlling the specifications for cards and for card readers. (Briefed III.D infra).

The *SJOrder's* grant of Defendants' MSJ of non-infringement, and denial of Smartmetric's MSJ of infringement--based on the (erroneous) conclusion that Defendants' EMVsystems lack a "local access number"--was **error of law** for 3 separate reasons.(Briefed III.E(1),(2),(3) infra):

(1) The asserted claims call for **"one of"** [not both] a "local access number" or a "default access number". Defendants did not deny that their EMVsystems have a default access number, and Gussin's declarations(A01253-A01403; A02739-A02850; and A03450-A03459) attest that Defendants' EMVsystems have a default access number. The *SJOrder* errs in failing to recognize that Defendants' EMVsystems are literally within the scope of the asserted claims if they include a **default access number, even if they do not include local access numbers or**

**database of such numbers.** Defendants' MSJ says nothing to the contrary. The *SJOrder* misses this point, though Gussin's declaration ¶¶10 and 19(A02743-A02745; A02748-A02749) attests Defendants' EMVsystems include such **default access numbers,** and local access numbers/databases of such numbers. (Briefed III.E.(1) infra).

(2) The *SJOrder* used an **erroneous definition** of the claim terms "local access number" and "database of local access numbers". That error of law **alone** requires reversing the *SJOrder's* of non-infringement. Claim interpretation is an issue of law. This Court should reverse the DC's erroneous definitions, and adopt SmartMetric's proposed definitions, which are correctly based on the intrinsic evidence. (Briefed IV, and III. E(2) infra). Using Smartmetric's definitions, Defendants' EMVsystems have "local access numbers" and database of local access numbers. *Id.*

(3) Even using the DC's erroneous definitions of those terms, Defendants' documents (A02743-A02749), show Defendants' EMVsystems have a "local access number" and a database of such numbers, and Gussin's Declarations (A01253-A01403; A02739-A02850; and A03450-A03459) attest to this (Briefed III.E.(3) infra).

Additionally, the *SJOrder* committed error of law by relying on the Declarations of Defendants' witnesses Merschen, Aabye and Grimes. Smartmetric had filed proper *Evidentiary Objections with Requests to Strike* those Declarations. The DC erred by overruling Smartmetric's *EvidentiaryObjections.* (See II.D infra).

The *SJOrder's* proposed "alternate basis" for ruling against Smartmetric, of did-not-exclude-Gussin's-Declarations-but-could-have-done-so, for slightly late service of Gussin's expert report, cannot justify denial of Smartmetric's MSJ on infringement, or grant of Defendants' MSJ on non-infringement. Excluding Gussin would be error of law, violating FRCP Rule 37(c)(1). Rule 37 precludes excluding

an expert where the late designation was "substantially justified" OR was "harmless". Here, the slightly late service of Gussin's expert report was "**substantially justified**", because it was **caused** by Defendants delaying for 7 months, in producing Defendants' key confidential documents, which showed how Defendants' EMVsystems functioned, though Smartmetric had requested those documents, in timely served Requests to Produce.

Defendants did not produce their confidential documents(A01151-A01154 and A01129-A01131), until February, 2013, which was **after** the DC's expert report service 12/31/2012 deadline(A01151-A01154). Gussin could not prepare his expert report without having/analyzing Defendants' key confidential documents showing how Defendants' EMVsystems functioned. The late service was also **harmless**. It was still months before trial, Defendants fully deposed Gussin after Gussin's report was served, and Smartmetric continued Smartmetric's MSJ so that Defendants could file/calendar their MSJ's for hearing with Smartmetric's MSJ, and after Defendants fully deposed Gussin. Because excluding Smartmetric's infringement expert Gussin, would be equivalent to dismissing Smartmetric's case, controlling Rule 37 case law requires a District Court to consider lesser sanctions than exclusion (such as continuance, which Defendants obtained by Stipulation). The *SJOrder* misconstrues Rule 37, and controlling Rule 37 case law (Briefed V. infra).

Finally, it was error for the DC to **fail** to grant summary adjudication to Smartmetric, that the **proper measure of damages in this case is a portion of Defendants' cost savings** obtained with the EMVsystems in the US. That is a pure issue of law, based on undisputed facts. (Briefed VI infra).

## ARGUMENT

## I.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no

genuine dispute as to any material fact and if the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a). On a motion for summary judgment, a district court must construe the evidence in the light most favorable to the non-moving party. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed. Cir. 2013) *Plantronics* at 1353, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). Vis-à-vis Defendants' non-infringement MSJ, Smartmetric was the nonmovant.

The *SJOrder's* grant of summary judgment to Defendants, of non-infringement is reviewed by this Court, ***de novo***, meaning **no deference** is given to DC's ruling. E.g., *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008), which states:

> "This court reviews a district court's grant of summary judgment of non-infringement without deference. *02 Micro Int'l. Ltd. v. Monolithic Power Sys, Inc.*, 467 F.3d 1355, 1359 (Fed Cir. 2006). 'Our de novo review of summary judgment of non-infringement requires two steps—claim construction, which we review without deference, and infringement, which we review to determine whether there was no genuine issue of material fact.' *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1312 (Fed Cir. 2007)."

This Court also reviews, ***de novo***, the SJOrder's **denial** of Smartmetric's motion for summary judgment to Smartmetric, that Defendants' EMVsystems infringe Smartmetric's asserted claims.

This Court reviews *de novo* whether a district court followed the proper framework for evaluating expert testimony. E.g. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 438 (7th Cir. 2013); cited in *Manpower, Inc. v. Ins. Co. of Pa*, 732 F.3d 796, 805 (7th Cir. Wis. 2013). The *SJOrder* committed error of law by failing to follow the proper framework for evaluating Gussin's Declarations. The DC should have focused on the fact Gussin had employed a valid **methodology** (methodology of analyzing Defendants' documents and admissions of defendants witnesses, to determine whether Defendants' EMVsystems contained each element in Smartmetric's asserted claims).

20

Gussin was qualified to testify as an expert. Gussin's Declarations used proper methodology. The *SJOrder* committed error of law in discounting Gussin's declarations as "conclusory", because an expert declaration that uses correct methodology is not "conclusory", as the expert's work can be back-checked by repeating it. The "conclusory" declarations were those of Defendants' declarants-- Aabye, Grimes, and Merschen—who, additionally, were **not** qualified to be experts. The *SJOrder* erred by failing to strike those Declarations

This Court reviews **claim interpretations de novo**—without deference, because claim interprestion is an issue of law. *Computer Docking Station* quoted, supra, *Plantronics* at 1348-49, supra, citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (en banc). Here the DC based grant of Defendants' MSJ non-infringement, and denial of Smartmetric's MSJ infringement, on erroneous definitions of the claim terms "local access number" and "database of local access numbers".

## II.    THIS COURT SHOULD REVERSE THE *SJOrder's* **DENIAL** OF SMARTMETRIC'S INFRINGEMENT MSJ, TO **GRANT** SUMMARY JUDGMENT TO SMARTMETRIC THAT DEFENDANTS' EMVSYSTEMS INFRINGE

This Court should reverse the *SJOrder's* denial of Smartmetric's MSJ on infringement, and should grant Smartmetric's infringement MSJ. As required by FRCP Rule 56(a), Smartmetric's evidence was admissible, and sufficient to prima facie prove infringement. Defendants failed to rebut Smartmetric's evidence, leaving it uncontroverted, with no genuine issue of material fact requiring trial.

### A.    Smartmetric's Evidence, on Smartmetric's MSJ on Infringement, was Sufficient to Prima Facie Prove Infringement

Gussin's Declarations(A01253-A01403; A02739-A02850; and A03450-A03459) attest that Defendants' own documents establish that Defendants' EMVsystems include all elements in Smartmetric's asserted claims. Gussin's

21

Declarations identify, by Bates number, the specific Defendant documents that show Defendants' EMVsystems include all elements[1] in Smartmetric's asserted claims. Gussin's Declarations additionally cite to, and rely on, deposition admissions from Defendants' Rule 30 (b)(6) witnesses.

Smartmetric is entitled to summary judgment that Defendants' EMVsystems infringe Smartmetric's asserted claims, because Defendants' declarants **failed to refute Defendants' own documents, failed to refute the admissions of Defendants' witnesses, and failed to address/refute Gussin's Declarations**. **None** of Defendants' Declarants said they reviewed Defendants' documents that Gussin identified/analyzed/relied on in Gussin's Declarations, that establish that Defendants' EMVsystems include all elements in the asserted claims. **None** of Defendants' Declarants deny that Defendants' documents, which Gussin relied on, show that Defendants' EMVsystems include all of these elements. **VISA and Mastercard filed no declarations or other evidence rebutting Gussin's declarations on these infringement issues.**

Defendants' documents, admissions of Defendants' witnesses, plus Gussin's declarations—**all unrebutted**--establish a prima facie factual showing of literal infringement of the asserted claims. This Court should reverse the *SJOrder*, to grant Smartmetric's MSJ infringement.(A01185-A01195; A01235-A01403; A03416-A03471 are Smartmetric's MSJ infringement, and Reply to Defendants' Opposition to Smartmetric's MSJ infringement).

B. **Gussin's Declarations are Admissible, and are NOT Conclusory**

Gussin's Declarations(A01253-A01403; A02739-A02850; and A03450-A03459) are based on Defendants' documents showing how Defendants' EMVsystems function. It is irrelevant that Gussin relies on more than a single

---

[1] Including that Gussin attested Defendants' documents show Defendants' EMV systems have a "local access number" and "a database containing a list of access numbers or the plurality of network service providers," even using the DC's erroneous definition of "local access number", and additionally attested that Defendants' EMVsystems have a "default access number".(A02743-A02749).

document to show presence of all claim elements. No authority requires a single document showing all the elements. Defendants' own documents that describe how Defendants' EMVsystems function are admissions of Defendants, admissible in evidence, against Defendants, pursuant to FRE Rule 801(d).

Infringement can be proven by a Defendant's admissions. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351 (Fed Cir. 2007), so holds. In *PharmaStem*, the admissions were insufficient to prove infringement. But here, Defendants' confidential documents that describe how Defendants' EMVsystems function, and which are admissions of Defendants, establish that Defendants' EMVsystems include all elements in Smartmetric's asserted claims, and Gussin's Declarations so attest. Admissions are probative evidence against the party making the admission. *E.g., Hanna v. Ishee*, 694 F.3d 596, 611 (6th Cir. 2012) ("Petitioner's own admissions provided the most probative evidence...."); *Paointhara v. INS*, 708 F.2d 472, 474 (9th Cir. 1983) (admissions, which in that case were admissions by party's counsel, may constitute substantial and probative evidence, sufficient to support ruling against party).

Gussin is an electrical engineer with 30 plus years experience; see his resume(A01265). He was qualified to testify as an expert on infringement, per FRE Rule 702. Defendants did not contend Gussin lacked qualifications to testify as an expert on infringement (not in Defendants' Opposition, A03255-A03413) and the *SJOrder* did **not** find Gussin lacked qualifications to testify as an expert on infringement.

Gussin's **methodology** for determining infringement is indisputably **valid**. Gussin examined Defendants' confidential documents (enumerated by bates production number), produced in this suit (admissible per FRE Rule 801(d) as admissions of Defendants), showing how Defendants' EMVsystems work, and examined deposition admissions of Defendants' witnesses, to determine whether Defendants' EMVsystems include all elements of Smartmetric's asserted claims.

Since Gussin was qualified as an expert, and used a valid methodology, Gussin's Declarations are admissible. *Manpower, Inc. v. Ins. Co. of Pa*, 732 F.3d 796, 806 (7th Cir. 2013) (reversed exclusion of expert).

The Official Advisory Committee Note to FRE Rule 702 on expert testimony states that an expert's report can only be excluded as "conclusory", if "it cannot reasonably be assessed for reliability", and that an expert's report which **makes clear the evidence the expert is relying on to form his conclusions, CANNOT properly be excluded as conclusory**, because the expert's conclusions can be tested objectively, by examining the evidence the expert is relying on to form those conclusions. *Carotek, Inc. v Kobayashi Ventures, LLC*, 875 F.Supp.2d 313, 337 (S.D.N.Y.2012) explains this clearly:

> "The Committee Note to FRE Rule 702(2000) states that an expert opinion is inadmissible as **conclusory** if it '**cannot reasonably be assessed for reliability**.' However, **if the report 'makes clear the evidence [the expert] is relying on to form his conclusions,' then '[i]t' is clearly possible to test those conclusions objectively' and the report should not be excluded**. *Lesser Camp Wildwood*, 282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003). Dr. Stevenson's **report painstakingly lays out the basis for his conclusions**, and plaintiffs are fully able to attempt to debunk them... Because the report 'cannot be deemed to be substantially incomplete,' *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, ... 2011 WL 5976076, at *11,... (E.D.N.Y. Nov. 28, 2011), we cannot preclude our consideration of it on this motion."

Here, Gussin's expert report(A01098-A01105) and Declarations(A01253-A01403; A02739-A02850; and A03450-A03459) identify Defendants' documents, by Bates production numbers, and the deposition admissions of Defendants' witnesses, that Gussin relied on to conclude that Defendants' EMVsystems include each element in Smartmetric's asserted claims. Therefore, it was error of law for the *SJOrder* to disregard Gussin's report/declarations by concluding they were "conclusory".

Consistent with the Advisory Committee Note to FRE 702, referred to in the *Carotek* quote immediately supra, the recent *Northbrook NY, LLC v. Lewis & Clinch, Inc.*, 2012 WL 4338740 at *7 (ND NY 2012) case held that expert

Shelton's report was reliable, and therefore admissible. This report **set forth the items of evidence that the expert relied on, in reaching the expert's conclusions**. *Northbrook, supra,* is factually parallel with the situation here. *Northbrook* held the expert report admissible, because "the Court is able to evaluate the bases for Sheldon's [expert] testimony", because Sheldon's "report listed thirty items of evidence that he [Sheldon] reviewed in making his conclusions and writing his report", including the report shows Sheldon reviewed **defendant's documents** and **transcripts from depositions and deposition exhibits**, taken in the litigation. This is precisely what Gussin did: Gussin's declarations list (by bates production number) **defendants' documents** that Gussin relies on, and **admissions of defendants' witnesses in deposition**, that Gussin relies on, in reaching Gussin's conclusion that defendants' EMVsystems contain each element of Smartmetric's asserted claims. See *Bullock v. Daimler Trucks North America, LLC,* 2010 WL 4259793 at *2 (D. Colo. 2010), which cites to the 2000 Advisory Committee Notes to FRE 702, in denying a motion to preclude testimony of expert Butler, noting that "plaintiff 'challenged [Dr. Butler's theory] in [an]objective sense,' which would not have been possible if the opinion was 'instead simply a subjective, conclusory approach' incapable of assessment".

As *Manpower, supra,* at 306 explains, the requirement that a DC determine that the expert used **reliable methods** ordinarily does **not** extend to the reliability of the conclusions those methods produce, i.e., whether the conclusions are unimpeachable. A district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than scrutinizing the **reliability of the methodology** the expert employed.

As explained in *Manpower,* supra at 806--citing the US Supreme Court *GE v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997): "the critical inquiry is whether there is a **connection** between the **data employed** and the **opinion offered**; it is the opinion connected to existing data 'only by the *ipse dixit*

of the expert,' *id.,* that is properly excluded under Rule 702." [bold/underline added for emphasis]

This Court reviews *de novo* whether a district court followed the proper **framework** for evaluating expert testimony. E.g. *Schultz*, supra at 438; cited in *Manpower*, supra at 805.

The *SJOrder* erred by failing to focus on Gussin's methodology in evaluating Gussin's testimony. Gussin's opinion that Defendants' EMVsystems include each element in Smartmetric's asserted claims is admissible, because Gussin is qualified to testify as an expert. Gussin's infringement opinion has the required **connection** to the **relevant data**, (the relevant data being Defendants' documents, each identified by bates production numbers by Gussin, plus admissions made by Defendants' witnesses in deposition).

In contrast, Defendants' Declarants (see II.D infra) on infringement-- Merschen, Aabye, and Grimes--are **not** qualified by education or experience to testify as experts. Their Declarations did n**ot** employ **proper methodology**. Their non-infringement opinions are **not** connected to any specific data, in violation of *GE.,* supra, and *Manpower*, supra. Smartmetric made timely *EvidentiaryObjections with Requests to Strike* those Declarations(A02536-A02539;A03434-A03436).

It was **double reversible error** for the DC to admit and rely on the **(inadmissible)** Merschen, Aabye and Grimes  Declarations, to grant Defendants' SJM non-infringement, and to deny Smartmetric's MSJ infringement, while refusing to give any weight to Gussin's Declarations—Declarations of an admittedly qualified expert who had employed proper methodology of analyzing Defendants' enumerated documents, and of Defendants' deposition admissions.

C. **The Cases the *SJOrder* cites, as Showing Gussin's Declarations are "Conclusory", Are All Obviously Inapplicable**

Every case cited by *SJOrder*(A07;A11) to justify discounting Gussin's

Declarations as being "conclusory", is factually distinguishable:

The *SJOrder*'s reliance on *Lockwood v. American Airlines,* 107 F.3d 1565 (Fed. Cir. 1997), *Becton, Dickinson & co. v. Tyco Healthcare Group, LP,* 616 F.3d 1249 (Fed. Cir. 2010), and *Motionless Keyboard co. v. Microsoft Corp.,* 486 F.3d 1376 (Fed. Cir. 2007), as showing Gussin's Declarations are "conclusory", is misplaced. These cases each granted summary judgment of non-infringement solely by deciding claim interpretation issues in favor of the accused infringers. In *Lockwood,* supra, the declaration at issue **admitted the absence** of a written description from a patent application needed to support a particular patent claim in that application, and could only speculate that the inventor envisioned the absent information. *Becton, Dickinson,* supra, found no infringement after changing the trial court's interpretation of the term "spring means", then finding absence of this element as redefined. *Motionless Keyboard,* supra, this Court sustained the trial court's claim interpretation, and its finding of non-infringement based thereon. No declaration testimony affected the holding. Here, in contrast to *Lockwood, Becton,* and *Keyboard,* Smartmetric's evidence established Defendants' EMVsystems include all elements in Smartmetric's asserted claims, using the DC's claim term definitions.

*Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.,* 589 F.3d 1179 (Fed. Cir. 2009), affirmed a trial court's claim interpretation, finding patentee's declarant had not identified the presence of certain claim elements in the accused system. In contrast, here, Gussin's declarations (A01253-A01403; A02739-A02850; and A03450-A03459) explain where/why **every** claim element is present in the EMVsystems, based on Defendants' documents, and on Defendants' deposition admissions.

The *Stamps.com Inc. v. Endicia, Inc.,* 437 Fed. Appx. 897 (Fed. Cir. 2011) (not for publication), *Innogenetics, N.V. v. Abbot Labs.,* 512 F.3d 1363 (Fed. Cir. 2008), and *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263 (Fed.

Cir. 2004) cases that *SJOrder* relies on for "conclusory" are not on point either. In *Stamps.com*, supra, this Court rejected a declaration on validity as "conclusory." Its critical paragraphs express only conclusions **without any underlying analysis**. Similarly, in *Innogenetics*, supra, this Court sustained exclusion at trial of the accused infringer's expert because his report **contained no analysis of the facts underlying the obviousness inquiry**, only a list of the prior art and the conclusion that this art established obviousness. In *Dynacore,* supra, this Court affirmed summary judgment of non-infringement because patentee's expert declarations provided only **unsupported conclusions** that certain claim elements were present in the accused device. Here, Gussin's declarations on infringement identify the documents (by bates production number), that Gussin relies upon, and provide the underlying analysis to show why Defendants' documents (plus admissions of Defendants' witnesses in deposition) establish Defendants' EMVsystems include each element in Smartmetric's asserted claims. *Stamps.com, Innogenetics and Dynacore* support discounting the Declarations of Defendants' Declarants Aabye, Grimes and Merschen as "conclusory", **not** discounting Gussin's Declarations as "conclusory".

    *Sitrick v. Dreamworks, LLC*, 516 F.3d 993 (Fed. Cir. 2008) rejected patentee's expert's declaration on enablement. The declarant admitted he couldn't make the claimed invention from the disclosure of the patent, proving invalidity for lack of enablement. Lack of enablement is not at issue here.

    *Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*, 111 Fed. Appx. 582 (Fed. Cir. 2004) (not for publication), reversed summary judgment of invalidity. The accused infringer filed **no declaration, expert or otherwise, in the trial court**. This Court held that defendant's attorneys' argument alone was insufficient for finding invalidity by clear and convincing evidence. Here, the Gussin declarations articulate where each element of the asserted claims appears in the EMVsystems based on Defendants' documents and admissions, proving infringement by a

preponderance of the evidence.

In *Schumer v. Lab. Computer Sys.*, 308 F,3d 1304 (Fed. Cir. 2002), this Court reversed summary judgment of invalidity because the accused infringer's expert declaration **did not articulate where the elements of the claim at issue were disclosed in the prior art** that the expert relied on. In contrast, here, Gussin's declarations identify, Defendants' documents that show presence in Defendants' EMVsystems of each element in Smartmetric's asserted claims; explain which document shows presence of which element and why; and shows, based on Defendants' documents/deposition admissions, that Defendants' EMVsystems include all elements in Smartmetric's asserted claims.

The *SJOrder* (A011) cites *Builders Concrete v. Bremerton Concrete Prods. Co.*, 757 F.2d 255 (Fed. Cir. 1985), as support for the proposition that Gussin has not shown that Defendants' EMVsystems include all elements of Smartmetric's asserted claims. But in *Builders Concrete,* unlike here, patentee **conceded the literal absence of a claim element** from the accused system. This Court affirmed summary judgment of non-infringement, rejecting patentee's argument that the missing claim element was present, under the doctrine of equivalents. Here, Defendants' documents and admissions, plus Gussin's Declarations, establish the literal presence of all claim elements, in Defendants' EMVsystems.

**D.    Defendants' Declarations were Insufficient to Create a Genuine Issue of Material Fact, Even if Admitted; and Should have Been Excluded, pursuant to Smartmetric's *Evidentiary Objections with Requests to Strike***

The Declarations of Defendants' witnesses Merschen, Grimes and Aabye **do NOT say** Defendants' Declarants examined Defendants' documents that Gussin analyzed and relied on, and **do NOT deny** that those documents show that Defendants' EMVsystems include all elements claimed in Smartmetric's asserted claims. Those Declarations are therefore insufficient to create a genuine dispute as

to whether Defendants' EMVsystems infringe Smartmetric's asserted claims, even if admitted.

However, the Merschen, Grimes and Aabye Declarations should have been excluded, per Smartmetric's *Evidentiary Objections/Requests to Strike* those Declarations(A02536-A02539 and A03434-A03436). The *SJOrder* committed reversible error by overruling Smartmetric's *Evidentiary Objections*, and admitting/relying on those defense Declarations.

Merschen was Mastercard's purported FRE Rule 702 "expert" on infringement, and MasterCard's Rule 30(b)(6) witness on the infringement issue. Merschen was **not qualified** to testify as an expert. Merschen's declaration, (A01871-A01874), shows that Merschen lacks the training and experience to qualify as an expert on infringement. In Merschen's deposition under Rule 30(b)(6)(A02660), Merschen admitted that he had never before analyzed, or testified about infringement in any contested matter. He didn't analyze the USPTO file history of the '464 patent, or of any patent at any time, and didn't know the relevance of the file history here. Merschen had not analyzed Gussin's 3/9/13 declaration(A01253-A01403) on infringement.

Merschen's 5/6/13 declaration(A01869-A01971) is **silent** about Gussin's declarations, and about Gussin's opinions on infringement. Merschen's Declaration does NOT say that Merschen has read Defendants' documents that Gussin's Declarations identified by Bates production number, analyzed and relied on. Merschen's Declaration does **NOT deny** that Defendants' documents, that Gussin relied on, show Defendants' EMVsystems include all elements in Smartmetric's asserted claims.

¶¶46-66(A01886-A01891) of Merschen's declaration are inadmissible because they lack a foundation. ¶¶17-21(A01875-A01877) are inadmissible because they show lack of personal knowledge, and are hearsay ("I am informed..."). ¶¶24-41 are inadmissible because they are irrelevant to infringement

(Merschen does not refer to the EMVsystems in these paragraphs). ¶¶22 and 42 to 64 are inadmissible because the law of the case is that the claims at issue are not limited to the examples in the specification of the '464 patent. Merschen's declaration does not identify **any specific document** he relied on to support his assertions.

Defendant VISA's only declarants on infringement were Aabye and Grimes. Aabye's 5/6/13 Declaration(A01523-A01531) was inadmissible and timely objected to by Smartmetric. Aabye was **not qualified** to testify on infringement. In his Rule 30(b)(6) deposition, Aabye testified(A02693) his only degree is a degree in **Library Science**, from a Danish college. He has no formal schooling in engineering, computer programming, or any other relevant discipline. Aabye testified he didn't know whether he is ill-suited to testify on the issue of infringement in this case, and admitted he had never before testified on infringement in any case. Aabye's declaration, ¶¶1-16, is inadmissible because Aabye lacks training or experience to testify on infringement. ¶¶3-16 are inadmissible because they lack a foundation

Like Merschen, Aabye admitted Aabye had not read or analyzed Gussin's 3/9/13(A02693) declaration on the infringement issue. Aabye did not know whether Gussin's opinions in that declaration were correct. Aabye's 5/6/13 Declaration does not discuss/dispute any of the opinions in Gussin's 3/9/13 declaration.  Aabye's declaration does not identify any documents to support Aabye's assertions.

The 5/6/13 Declaration of Visa's Grimes(A01532-A01540), Visa's second declarant regarding non-infringement is **inadmissible.** Grimes relies completely on Aabye's (inadmissible) declaration, for all "facts". All Grimes' Declaration does is state Grimes's conclusions, based solely on Aabye's **inadmissible factual assertions.**

All three of Defendants' declarants' declarations should be held inadmissible, or, if found admissible, given no weight under FRCP Rule 56(c)(4). Rule 56(c)(4) requires a declaration to "show that the affiant or declarant is **competent** to testify on the matters stated" in that witness' declaration.

### E.  The Uncontroverted Evidence Entitles Smartmetric to Summary Judgment that Defendants' EMVsystems Infringe Smartmetric's Asserted Claims

Smartmetric's **uncontroverted evidence** meets the Rule 56(a) standard for grant of summary judgment for "no genuine dispute as to any material fact", that Defendants' EMVsystems include all elements in, and therefore literally infringe, Smartmetric's asserted claims. This Court should reverse the *SJOrder's* **denial** of Smartmetric's MSJ infringement, and instead  **grant summary judgment of infringement to Smartmetric.**

### III.  THIS SAME LAW AND EVIDENCE—WHICH REQUIRES GRANTING SMARTMETRIC'S INFRINGEMENT MSJ— REQUIRES REVERSING THE *SJOrder's* GRANT OF SUMMARY JUDGMENT OF NON-INFRINGEMENT TO DEFENDANTS

The same law and evidence, briefed in **II.** immediately supra,  requires reversing, as error of law, and clear error of fact, the *SJOrder's* grant of Defendants' non-infringement MSJ.

### A.  Granting Defendants' MSJ Non-Infringement was Error of Law, Contary to Rule 56(a) and Case Law

Granting Defendants' MSJ of non-infringement was error of law. The legal standard for grant of summary judgment to defendants was **not** met. Per *Innovention Toys, LLC v. MGA Entertainment, Inc.*, 637 F.3d 1314, 1319 (Fed Cir. 2011), the test for when it is proper to grant summary judgment of infringement, or of non-infringement, is as follows:

> "... a court may determine infringement on summary judgment 'when **no reasonable jury could find** that every limitation recited in the properly construed claim either is or is not found in the accused device.'"

Based on the evidence briefed in II, supra, a reasonable jury could NOT find non-infringement. A reasonable jury could only find infringement.

**B.** **Regarding Defendants' MSJ on Non-Infringement, All Evidence was Required to be Construed in the Light Most Favorable to Non-Movant Smartmetric; the *SJOrder* Committed Error of Law by Construing All Evidence AGAINST Smartmetric, in Favor of Defendants**

Regarding Defendants' MSJ for non-infringement, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and if the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a). Controlling Rule 56 case law, requires construing all the evidence in the light most favorable to non-movant. *Plantronics,* 724 F.3d at 1353 citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). On review, the appellate court must determine, **viewing the evidence in the light most favorable to non-movant**, whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004); *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Reversal of Defendants' MSJ non-infringement is required. The DC was required to, but failed to, construe the evidence in the light most favorable to non-movant Smartmetric.

**C.** **Defendants' Documents and Admissions, and Gussin's Declarations, Even Viewed (in error) in the Light Most Favorable to Defendants, Created a Genuine Issue of Material Fact Regarding Infringement/Non-Infringement, which Made it Error**

33

**of Law to Grant Defendants' MSJ of Non-Infringement**

Defendants' documents (which are admissions of Defendants, admissible against Defendants' per FRE Rule 801(d)), which Gussin identified by Bates number, analyzed, and relied on, in Gussin's declarations, plus Defendants' deposition admissions, plus Gussin's Declarations, **create genuine issues regarding infringement**, which made it error of law for the *SJOrder* to grant summary judgment of non-infringement to Defendants.

The DC erred by **ignoring** this evidence, contrary to the settled law of the US Supreme Court (*Liberty Lobby*), this Circuit (*Plantronics*), and the 9th Circuit that all evidence must be construed, as regards Defendants' MSJ, in the light most favorable to Smartmetric. Numerous Circuit decisions have reversed summary judgments, because--as here--the declaration of respondent's expert was admissible, and created a genuine issue of material fact, precluding granting summary judgment. *E.g., Bulthius v. Rexall Corp.*, 759 F.2d 1315, 1318-19 (9th Cir.1985) and *Bieghler v. Kleppe*, 633 F.2d 531, 534 (9th Cir.1980), *Ambrosini v. Labarraque*, 966 F.3d 1464, 1470-71(DC Cir. 1992).

D.   **The *SJOrder* Erred--in Granting Defendants' MSJ, and Denying Smartmetric MSJ--by Ruling Defendants Did Not Infringe, on the Basis that Defendants' Lacked Control over Defendants' EMVsystems**

The *SJOrder's* finding(A012-A013) of non-control is clear error of fact and error of law. Defendants **admitted they control** (Meschen depo.,A02674-A02678,quoted in FACTS supra) every element of Defendants' EMVsystems, including Defendants set the specifications for the EMV system data cards, and for the data card readers. EMV cards state Mastercard or VISA on the cards only if they conform to these specifications(A02674-A02677). See Gussin's 5/24/13 declaration(A02749-A02751), which notes Defendants **admit controlling every claimed element in the EMVsystems,**

Defendants Rule 30(b)(6) witnesses, Ms. Balfany(A03191-A03234) and Ms. Ericksen(A03236-A03254) **admitted** VISA and Mastercard **benefit** from the reduced fraud losses that the EMVsystems provide. Mastercard's and VISA's own documents (A3103-A3189) show that Mastercard and VISA estimate saving billions of dollars from the EMVsystems, instead of the old magnetic stripe cards.

The *Akamai Techs., Inc. v. Limelight Networks, Inc.,* 692 F.3d 1301 (Fed. Cir. 2012), and *Centillion Data Systems, LLC v. Qwest Comm'ns Int'l, Inc.,* 631 F.3d 1279, 1284 (Fed. Cir. 2011) cases, cited in *SJOrder* support Smartmetric. *Centillion,* supra, at 1284 holds that "use" infringement requires only that the infringer **controls** the system as a whole, and **benefit from use** of the system. *Akamai,* supra at 1305-19, only requires an infringer to **control** the claimed elements. Defendants **admitted** both.

Neither *Akamai* nor *Centillion,* nor the other cases *SJOrder* cites, require the infringer to manufacture/make each element—or any element--of the infringing system, for there to be "use" infringement. It is **irrelevant** for the *SJOrder*(A011-A012) to say Defendants do make or not sell smartcards, make smartcard readers, insert smartcards into readers, interact directly with cardholders, or engage in other functions that the cardholder or the merchant perform; because doing those things are not among the 6 elements claimed in Smartmetric's asserted claims.

To infringe claim 1, under *Centillion*, Defendants need only control, and benefit from use of Defendants' EMV systems, as they do. Those systems contain the 6 elements in Smartmetric's asserted claims. To infringe claim 14, under *Centillion/Akamai*, Defendants must/do control only the two method steps: configuring, and immediately triggering.

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.,*424 F.3d. 1293 (Fed. Cir. 2005), and *NTP, Inc. v. Research in Motion, Ltd.,* 418 F3d. 1282 (Fed. Cir. 2005), cited in *SJOrder,* are factually distinguishable. In *Cross Meds.*, the accused product, a medical device, could infringe only if assembled in one of several

permissible ways. Here, there is no non-infringing configuration of Defendants' EMV system. In *NTP*, supra, some parts of the accused system were located outside the US. Here, all elements of the accused systems are located in the US.

**E.    For 3 Separate Reasons, the *SJOrder* Erred, by Granting SJ of Non-Infringement to Defendants on the Basis that Defendants' EMVsystems Did Not Contain "Local Access Numbers"/ "Database of Local Access Numbers"**

*1.    Defendants did __Not Deny__ that Defendants' EMVsystems have Default Access Numbers, Gussin Attests Defendants' EMVsystems Have Default Access Numbers, and Smartmetric's Asserted Claims Require "__One Of__" "Local Access Number" and "Default Access Number", NOT Both*

The *SJOrder* committed **error of law** in granting Defendants' non-infringement MSJ, and denying Smartmetric's infringement MSJ, based on the (erroneous) conclusion that Defendants' EMVsystems **lack a "local access number"**. The asserted claims call for **"one of"** [not both] a "local access number" or a "default access number". Defendants did not deny that their EMVsystems have a default access number. Gussin's declarations(A01253-A01403, A02739-A02850, A03450-A03457) attest that Defendants' EMVsystems have a default access number.

The *SJOrder* errs by failing to recognize that the EMVsystems are literally within the scope of the asserted claims if they include a **default access number, even if they do NOT include** local access numbers or **database of such numbers**. The *SJOrder* does not address presence of default access numbers. Gussin's Declaration, at ¶¶10 and 19(A02743-A02749), attests Defendants' EMVsystems include **default access numbers**, in addition to including **local**

36

**access numbers**/databases of such numbers.

### 2. *The SJOrder's Grant of SJ of Non-infringement to Defendants is Based on Error of Law by Using an Erroneous Definition of "Local Access Number"*

The *SJOrder* granted Defendants' non-infringement MSJ, and denied Smartmetric's infringement MSJ, based on its **erroneous definition** of "local access number." Briefed at **IV** infra, explaining what the correct definition should be. This error of law alone requires reversal of the *SJOrder*.

### 3. *Even Using the Erroneous Definition of "Local Access Number", Defendants' Documents and Admissions, Plus Gussin's Declarations, Established Defendants' EMVsystems include "Local Access Numbers"/Database of Those, Precluding Grant of Summary Judgment of Non-infringement for Lack of "Local Access Numbers"*

Gussin's Declarations(A01253-A01403, A02739-A02850, A03450-A03457) establish that, even using the DC's erroneous definitions of "local access number" (and databases of local access numbers), Defendants' documents show that Defendants' EMVsystems include both. Gussin's 5/24/13 declaration(A02739-A02850) attests that Defendants' documents show that Defendants EMVsystems include each of the 6 elements of Smartmetric's asserted claims. ¶¶10 and 19 of Gussin's 5/24/13 declarations(A02743-A02749) explain where the EMVsystems have local access numbers and databases containing these numbers, refuting the **conclusory** declarations of VISA's Grimes and Aabye, and the *SJOrder*'s erroneous factual findings(A08-A010) that Defendants' EMV systems **lack** those elements.

Gussin's 5/24/13 declaration(A02739-A02850) **attaches as exhibits**

**Defendants' documents (bearing bates production numbers) that Gussin relies on**, as the basis for Gussin's opinion that **all 6 claimed** elements are present in Defendants' EMV systems, **including "local access numbers"** and databases of same. Gussin's 5/25/2013 declaration(A02748-A02749), ¶¶18,19, additionally explains how the EMVsystems literally infringe Smartmetric's claim 14.

### F. The *SJOrder* Erred in Failing to Sustain Smartmetric's Valid *Evidentiary Objections/Requests to Strike* the Declarations of Defendants' Declarants

For the reasons briefed in section II. D., supra, the *SJOrder* committed error of law by overruling Smartmetric's valid *Evidentiary Objections with Requests to Strike* the Declarations of Defendants' Declarants Merschen, Aabye and Grimes.

### G. The *SJOrder*'s Conclusion of Non-Infringement is Error of Law

The *SJOrder,* in error, says(A08), that "Defendants offer evidence [of non-infringement]". But the only "evidence" of non-infringement the *SJOrder* cites is the conclusory and inadmissible Aabye declaration, ¶¶11-12(VISA), the conclusory and inadmissible Grimes declaration, ¶¶9-11(VISA), and the conclusory and inadmissible Merschen declaration (Mastercard). These declarations cite no documents, provide no analysis to support their conclusory assertions of non-infringement, do not claim to have read Defendants' documents that Gussin relied on, and are **silent** about Gussin's declarations (which attests Defendants' documents, and admissions of Defendants' witnesses, establish all 6 elements claimed in Smartmetric's asserted claims). The *SJOrder* violates controlling case law by failing to view the evidence on infringement in the light most favorable to Smartmetric, the non-movant.

The *SJOrder*'s criticisms(A08-A012) of Gussin's declaration, err by

viewing the evidence **in the light most favorable to Defendants**, and against Smartmetric, the non-movant, citing as authority only the irrelevant *Builders' Concrete* case, supra .

Gussin's declarations are more than adequate to establish, prima facie, that Defendants' EMVsystems literally infringe Smartmetric's asserted claims. Defendants' did NOT rebut (1) Gussin's declarations(A01253-A01403; A02739-A02850; and A03450-A03459), (2) Defendants' documents showing infringement, or (3) the deposition admissions of Defendants' witnesses.

## IV.    THIS COURT SHOULD REVERSE THE *SJOrder*, AS BEING BASED ON <u>ERRONEOUS DEFINITIONS</u> OF THE CLAIM TERMS "LOCAL ACCESS NUMBER"/DATABASE OF THOSE; AND SHOULD DEFINE THOSE TERMS AS SMARTMETRIC REQUESTED

On appeal, this Circuit addresses claim construction **as a matter of law**, and reviews the District Court's claim construction **without deference**. *Sunovion Pharms., Inc. v. TEVA Pharms., USA, Inc.*, 731 F.3d 1271, 1275 (Fed Cir. 2013), citing to *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454–56 (Fed.Cir.1998) (en banc). Therefore, the DC's claim construction of "local access numbers" is reviewed here *de novo,* without deference to the DC. *Plantronics* 1348-49, supra, citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (en banc).

When construing claim terms, below and on appeal, courts first look to, and primarily rely on, the **intrinsic evidence**, including the **claims themselves**, the **specification**, and the **prosecution history** of the patent, **which is usually dispositive**. *Sunovion*, supra, Id at 1276 [bold/underline added for emphasis], citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc); and *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).

Smartmetric's proposed definitions of "local access number" and "database of local access numbers" follow these principles. The DC's definitions don't.

Patent claims must be construed according to their **ordinary meaning to one skilled in the art.** *Sunovion, Id.* at 1276, citing to *Phillips,* 415 F.3d at 1312 (quoting *Vitronics*).   As *Sunovion*, supra, at 1276 explains: "Claim terms 'are generally given their ordinary and customary meaning,'" if the terms have such a meaning. Defendants did not deny that Smartmetric's expert, Gussin, is a person skilled in the art. (*E.g., Phillips v. AWH Corporation,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ("*Phillips*" hereafter).

In *Phillips*, at 1312-1323, this Court required reading claims in light of the patent specification, while **avoiding the temptation to import limitations** from the embodiments in the **specification** into the **claims**, confirming the "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled to the right to exclude.'" *Id.* at 1312, quoting *Innova/PureWater, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

Smartmetric asks this Court to interpret these claim terms as would a person of ordinary skill in the art to mean: "an access number that is either an access number with corresponding location information or a network service provider" and "a database with a list of access numbers with corresponding location information or network service providers with corresponding location information." This interpretation correctly uses defining language from claims 1 and 14, which specify what "local" means in these claims.

The definition of "local access number", used in the *SJOrder*, violates *Phillips'* claim interpretation principles, because it uses language from dependent claims 2 and 15, that is **absent** from claims 1 and 14, to define the term "local access number" in claims 1 and 14. **This error violates *Phillips'* claim differentiation principles**. See *Phillips* at 1314-1315, which states:

"Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. (Citation omitted) For example, the

40

presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is **not present** in the independent claim." (bold/underline added for emphasis).

The PTO file history of the '464 patent(A0314-A0339) shows that the terms at issue here appeared in the claims of the application for the '464 patent, and issued without change. The PTO's reasons for allowance(A0325) do not define/construe "local number" as the DC erroneously did.

The "local number" refers to the degree of proximity between the processing location and the data card reader where a transaction originates. It is enough to satisfy the asserted claims if the processing location is geographically close to, or local to, the location of the card reader where the transaction is initiated.

Gussin's declarations(A01253-A01403; A02739-A02850; and A03450-A03459) on infringement, particularly ¶¶10 and 19, quoted above at pages 6-8, readily show literal infringement, if this Court adopts the interpretations of "local number" and "database of local numbers" that Smartmetric proposed below (A0291-A0293).

Because claim interpretation is an issue of law, this Court should reverse the DC's erroneous definitions of "local access number" and "database of local access numbers" and should adopt Samrtmetric's definitions, which are compelled by the intrinsic evidence, obedient to *Phillips*.

### V. THE *SJOrder*'s GRANT OF DEFENDANTS' NON-INFRINGEMENT MSJ, AND DENIAL OF SMARTMETRIC'S INFRINGEMENT MSJ, <u>CANNOT</u> PROPERLY BE AFFIRMED ON THE BASIS THAT SMARTMETRIC WAS SLIGHTLY LATE IN SERVING GUSSIN'S EXPERT REPORT

While **not** excluding Gussin, the DC's *SJOrder* (A014-A016) says the DC **could have** excluded Gussin as an expert, because Smartmetric was slightly late serving Gussin's expert report, and then could have granted summary judgment against Smartmetric after excluding Gussin. Excluding Gussin for slightly late service of Gussin's report would be reversible error of law, contrary to FRCP Rule

41

37(c)(1) and controlling case law. The DC's (erroneous) grant of summary judgment of non-infringement to Defendants **cannot properly be affirmed** on the DC's suggested "alternate basis" that Gussin could have been excluded as a witness, because Smartmetric was slightly late in serving Gussin's expert witness reports.

### A. Text of FRCP Rule 37(c)(1)

The DC's refusal to extend the discovery schedule set in the DC's original Rule 16 scheduling order, means Gussin's expert report was served slightly later than the date set in that scheduling order (A0797-A0799). However, exclusion of experts is governed by FRCP Rule 37(c)(1), not by Rule 16 (scheduling), or by Rule 26 (designation of experts). The Rule 37(c)(1) standard for excluding an expert witness for "failure to disclose" is NOT met here. Rule 37(c)(1) states:

> "(1) If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, **unless** the failure was **substantially justified** OR is **harmless**. In addition to or **instead of this sanction**, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, cause by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, . . . ."
>
> [bold/underline/capitalization of "**OR**" added for emphasis].

Rule 37(c)(1) precludes excluding Gussin for "failure to disclose", because Smartmetric's slightly late service of Gussin's expert report was **BOTH substantially justified**, based on the uncontroverted evidence below, **AND** was **harmless**. Smartmetric disclosed Gussin, and served his report on Defendants in

March 2013. This is just a short delay in serving Gussin's expert report, still during discovery, months before trial.

**B.** **Defendants Prevented Smartmetric from Being Able to Serve Gussin's Expert Report on Time, by Defendants' 7 Month Delay In Producing Defendants' Confidential Documents, that Showed How Defendants' EMVsystems Function**

The short delay in serving Gussin's expert report was "substantially justified", as that term is used in Rule 37(c)(1), because it was **caused by Defendants' 7 month delay in producing Defendants' key confidential documents** showing how Defendants' EMVsystems function, which expert Gussin needed to complete his analysis and report. Defendants' delaying 7 months (through repeated motion practice) in producing Defendants' key confidential documents, prevented Gussin from being able to complete Gussin's analysis and expert report by the 12/31/12 serve-expert-reports date set by the DC's Scheduling Order(A0797-A0799).

Gussin's expert report(A01098-A01105), and Gussin's Declaration (A01151-A01154) attested that Gussin could **not** prepare his analysis or report without having and analyzing Defendants' key confidential documents. Defendants offered no contrary evidence. Smartmetric had timely requested Defendants' documents (that Defendants withheld for 7 months), by Smartmetric's Document Requests(A01129-A01150), served in June, 2012. Due to Defendants' repeated motions resisting producing Defendants key confidential documents, Defendants did not produce Defendants' key confidential documents, showing how Defendants' EMVsystems worked, until 2/13/13, which was **after** the 12/31/12 date set by the Court's scheduling order for serving expert reports.

Unsupported by any evidence, Defendants(A01098-A01105) argued that Gussin did not need Defendants' documents to do Gussin's infringement analysis. So arguing was contrary to Gussin's uncontroverted Declaration(A01151-A01154)

attested Gussin could not complete his analysis or report without having Defendants' key confidential documents that showed how Defendants' EMV systems functioned. See Gussin's 3/9/13Decl.in Chief[2] (A01253-A01403), so stating. As Gussin's Decl. in Chief(A01253-A01403) explains, it is Defendants' late produced documents (which are among Defendants' documents cited in, and attached as Exhibits to, Gussin's Declaration in Chief)  that show that Defendants' EMVsystems include each element in the asserted claims. As Gussin's Report (A01098-A01105) and Declaration(A01151-A01154) each attest, Gussin **could not complete his analysis or his report, without having Defendants' confidential documents** showing how Defendants' EMVsystems functioned.

Defendants did not cite, and Smartmetric's research did not find, any FRCP Rule 37(c)(1) case where an expert was excluded for late service of expert's report, where the **late service was caused by the defendant having delayed** in producing timely requested documents, **until after the expert report service deadline**.

## C. **The Short Delay in Serving Gussin's Report was Harmless**

In addition to being substantially justified, the short delay in serving Gussin's expert report was **harmless**, as that term is used in Rule 37(c)(1), for multiple reasons: (1) the case was still in discovery; (2) the case was months from trial; (3) Defendants fully deposed Gussin, **after** Defendants were served with Gussin's expert report(A01098-A01105 expert report), **after** Defendants had been served with Gussin's 3/9/13 Declaration(A01253-A01403) in support of Smartmetric's infringement MSJ(A01237-A01403), and well **before** Defendants had to respond to Smartmetric's infringement MSJ(A01489-A01971 shows timing); (4) Smartmetric stipulated to continue the hearing date of Smartmetric's MSJ of infringement, so that Defendants could file Defendants' non-infringement cross-MSJ, after Defendants fully deposed Gussin, and could calendar Defendants'

---

[2]Gussin's 3/9/13 Declaration is incorporated by reference into Smartmetric's Reply (A3436-A03442).

cross-MSJ for hearing with Smartmetric's MSJ, which is what occurred.(A04013-A04027), Bright Decl. attests to this stipulation); and (5) the DC asked Defendants if they wanted any relief other than excluding Gussin, and Defendants' counsel declined(A03994, transcript of 6/24/2013).

### D. Even Where a Failure to Designate is NOT Substantially Justified, and is NOT Harmless, Controlling Case Law Requires DCs to Utilize Lesser Sanctions (such as Continuance) instead of Exclusion, if Excluding the Expert Would be Tantamount to Dismissal of Plaintiff's case, as it Would be Here

Even if the lateness was not substantially justified, and not harmless, controlling case law, *R&R Sailing v Insurance Co of Pennsylvania*, 673 F.3d 1240 (9th Cir. 2012), requires the DC to invoke lesser sanctions, e.g., a trial continuance, specified in FRCP Rule 37(c) (A), (B) and (C) rather than exclusion, if excluding the expert would be tantamount to dismissal of plaintiff's case, as it would be here, because a plaintiff cannot win an infringement case without an expert on infringement.

Rule 37(c)(1), subsections (A), (B) and (C), provide for lesser sanctions than exclusion of the expert witness, including informing the jury of the failure to properly designate, staying the matter until the order is obeyed (i.e., continuance), etc. Excluding Smartmetric's expert on infringement for the short delay in serving the Gussin expert report would have been equivalent to granting summary judgment against Smartmetric, and would be reversible error.

The Federal Circuit reviews exclusions of evidence under the law of the regional circuit. *See, e.g., Tokai Corp. v. Easton Enters.*, 632 F.3d 1358 (Fed. Cir. 2011). The controlling 9th Circuit Rule 37(c)(1) case, *R&R Sailing v Insurance*, supra, at 1247-48, holds that where excluding evidence would result in a claim being dismissed, the Court is required to:

1. "consider whether the claimed noncompliance involved willfulness,

fault or bad faith" AND

  2."also to consider the availability of lesser sanctions" [such as continuance. (cites omitted)

*R&R Sailing, Id.,* cites numerous cases requiring district courts to consider whether lesser sanctions, **like a continuance**, can solve the problem of late expert disclosure, including citing with approval Second and Fifth Circuit cases requiring weighing whether a **continuance** would cure prejudice to the opposing party of failure to timely disclose an expert, **even** where that failure was **not substantially justified** and was **not harmless**. Here, Smartmetric's short delay in serving Gussin's expert report was substantially justified, because caused by Defendants' 7 month delay in producing Defendants' key confidential documents, and was harmless. But Smartmetric none-the-less **stipulated to a continuance** of Smartmetric's MSJ, to allow Defendants to fully depose Gussin, and then to calendar Defendants' cross-MSJ for hearing with Smartmetric's MSJ.

  Many Circuit level cases state that federal courts strongly prefer to decide cases on their merits, **rather than on procedural ground**s. E.g. *Cody v. Mello,* 59 F.3d 13, 15, (2nd Cir. 1995); *Aikens v. Ingram,* 652 F3d 496, at 523(4th Cir. 2011), where 4th Circuit states:

> "Thus where, as here, a district court exercises its discretion in a case-dispositive manner, this court should scrutinize the exercise of that discretion with care to ensure that there has not been an 'error of judgment' by the District Court. *Wilson v. Volkswagen of Am, Inc, 561 F.3d 494, 506 (4th Cir. l977)* (warning against the threat of becoming a 'rubber stamp' as to dispositive, 'door-slamming' orders of district courts.) Where, as here, such a prejudicial error of judgment comes before us, we should correct the error. **This approach is in keeping with this court's strong preference that cases be decided on their merits.** Cf. *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.,* 616 F.3d 413, 417 n.3 (4th Cir. 2010) ('[W]e have long adhered to the sound public policy of deciding cases on their merits, ...and not depriving...part[ies] of[their] fair day in court.") (citations and internal quotations omitted)."

Numerous 9th Circuit decisions say that "cases should be decided upon their merits whenever reasonably possible", *e.g., Westchester Fire Ins. Co. v Mendez*, 585 F.3d 1183 (9th Circ. 2009); *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).

## VI.  THIS COURT SHOULD GRANT SUMMARY ADJUDICATION THAT IF INFRINGEMENT IS PROVEN, THE PROPER MEASURE OF DAMAGES IN THIS CASE IS A <u>PORTION OF THE COST SAVINGS</u> DEFENDANTS OBTAINED FROM USE OF THE INFRINGING EMVSYSTEMS

This Court has repeatedly held that awarding a **portion of the cost savings**, which a Defendant obtains by infringing a patentee's patent, is a **"well settled method of determining a reasonable royalty"**, where patentee is not manufacturing/selling in competition with Defendant, and where the patent Defendant is infringing has not been licensed. E.g., *Powell v. Home Depot U.S.A. Inc.*, 663 F.3d 1221, 1240 (Fed Cir. 2011), rehearing en banc denied 2/10/12; *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed Cir. 1983); *Monsanto Co. v. McFarling*, 488 F.3d 973, 980 (Fed. Cir. 2007). In *Home Depot*, supra at 1240, this Circuit stated:

> " 'Reliance upon **estimated cost savings** from use of the infringing product is a **well settled method** of determining a **reasonable royalty**.' Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1080-81 (Fed Cir. 1983). Further, we have held that when considering the amount of a use-based reasonable royalty 'adequate to compensate for the infringement,' 35 U.S.C. §284, a jury may consider not only the benefit to the patentee in licensing the technology, but also the **value of the benefit conferred to the infringer by use of the patented technology**. Monsanto Co. v. McFarling, 488 F.3d 973, 980 (Fed. Cir. 2007)..." [Bold/underline added for emphasis].

The Declaration of Smartmetric's CEO, Hendrick(A03057-A03100), was uncontroverted, that Smartmetric was not making/selling a smart card processing

system in competition with Defendants, and that Smartmetric's '464 patent in suit had not been licensed. Under the controlling *Home Depot*, *Hanson*, and *Monsanto* cases cited supra, the applicable measure of damages, if Defendants' EMVsystems are found to infringe Smartmetric's asserted claims, is a **portion of the cost savings** obtained.

FRCP Rule 56(f) provides that on proper notice, a District Court can grant summary judgment **in favor of the non-movant**, if the facts and law justify doing so, and if there has been proper notice. The *Cool Fuel, Inc. v. Connant*, 685 F.2d 309 (9th Cir.1982) line of cases say the same. Smartmetric is the nonmovant, as regards Defendants' MSJ on damages.

Smartmetric's Opposition(A02960-A02969), to Defendants' MSJ on damages(A01404-A01488), makes a *"Cool Fuel"* request, seeking summary adjudication that the correct measure of damages, under *Home Depot*, *Hanson*, and *Monsanto*, is a **portion of the cost savings** obtained, if Defendants' EMVsystems are held to infringe Smartmetric's asserted claims.

This is a pure issue of law, per uncontroverted facts. This Court can and should issue summary adjudication as Smartmetric requests, on this issue.

## VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Smartmetric met the Rule 56(a) standard for grant of summary judgment of infringement in Smartmetric's favor. Defendants did **NOT** meet that standard for grant of summary judgment of non-infringment in Defendants' favor.

This Court should (1) **reverse** the *SJOrder's* denial of Smartmetric's MSJ on infringement, (2) **grant** Smartmetric summary judgment that Defendants' EMVsystems literally **infringe** Smartmetric's asserted claims, (3) **reverse** the *SJOrder*'s grant of Defendants' non-infringment MSJ, and (4) **reverse** the Judgment against Smartmetric.

Defendants' documents, plus admissions of Defendants' witnesses in

deposition, plus expert Gussin's declarations, were admissible, and prima facie proved infringement. Defendants failed to rebut Smartmetric's evidence, leaving Smartmetric's evidence **uncontroverted**.

Is was error of law to grant of Defendants' infringement MSJ, because Defendants' "evidence" was **controverted** by (1) Defendants' own documents, (2) Defendants' admissions in deposition, and (3) Gussin's unrebutted Declarations; and because the Declarations of Defendants' Declarants (not Gussin's Declarations) should properly have been excluded, per Smartmetric's *Evidentiary Objections/Requests to Strike.*

The *SJOrder* erred in discounting Gussin's Declarations (which were **not** conclusory), as "conclusory". Gussin was qualified to testify as an expert on infringement, and used a sound methodology—identifying and analyzing Defendants' own documents, plus admissions of Defendants' witnesses, to determine whether Defendants' EMVsystems contained all claim elements.

Nor could Gussin's Declarations have properly been excluded on the basis that Gussin's expert report was served slightly late. That lateness was **substantially justified**, because **caused** by Defendants' delaying 7 months—to beyond the service date set in the Court's scheduling order--in producing Defendants' key confidential documents that showed how Defendants' EMVsystems functioned; the lateness was **harmless**; and it was solved by Smartetric stipulating to **continuance**.

The **inadmissible** declarations were the Declarations of **Defendants' Declarants** (Aabye, Grimes and Merschen), inadmissible for **lack of qualifications**, and **lack of foundation** for the conclusory "non-fringment" opinions given.

The *SJOrder* committed **double error of law**, by refusing to give any weight to Gussin's Declarations as "conclusory", when Gussin's Declarationsy were **not** conclusory; yet admitting and relying on the Aabye/Grimes/Merschen

Declarations, which were inadmissible, being conclusory opinions of unqualified witnesses.

The **SJOrder** committed **error of law by overruling** Smartmetric's **Evidentiary Objections/Requests to Strike** Aabye's Declaration (not qualified to testify on infringement, only degree was in library science, and did not claim to have ever reviewed Defendants' documents that Gussin relied on), Grimes' Declaration (relied completely on Aabye's inadmissible declaration for facts, and did not claim to have reviewed Defendants' documents that Gussin relied on), and Merschen's Declaration (not qualified to testify as expert on infringment, and did not claim to have reviewed Defendants' documents that Gussin relied on).

But even if Aabye's, Grimes' and Merschen's Declarations are (in error) NOT excluded, they **do NOT refute** Gussin's Declarations, because none of these Declarants claim to have reviewed Defendants' key documents, which Gussin identified and relied on, which establish that Defendants' EMVsystems infringe. That leaves Gussin's Declarations **uncontroverted.**

The **SJOrder's** conclusion, that Defendants do not control or benefit from use of Defendants' EMVsystems, is error of law, contrary to this Court's controlling case law on control, and is clear error of fact. Defendants' witnesses **admitted** in deposition that Defendants **control** every element of Defendants' EMVsystems, and **benefit** by reaping big cost savings, via use of the accused EMVsystems reduces fraud. These admissions establish control.

The **SJOrder's** finding of no "local access numbers" was error of law for **three** reasons: (1) error of law because it was based on an **erroneous definition** of "local access numbers", contrary to the intrinsic evidence, which error **alone** requires reversal; (2) error because it is contrary to the fact that Smartmetric's asserted claims only require "**one of**" a local access number, and a **default access number**, **not both**, and Gussin's Declaration(A02743-A02749) attested Defendants' EMVsystems have **default access numbers**, which Defendants did

not deny; and (3) error because even using the DC's erroneous definition of "local access number", Defendants' documents showed Defendants' EMVsystems did have "local access numbers", as Gussin's Declaration attests.

The **proper definition** of "local access numbers" is a question of law. This Court should correct the DC's erroneous definition, and adopt Smartmetric's definition. Smartmetic's definition is correct under intrinsic evidence and *Phillips*.

Additionally, this Court should grant summary adjudication that the proper measure of damages in this case is a portion of the **cost savings** obtained from use of Defendants' infringing EMVsystems in the US. That is purely an issue of law, based on the uncontroverted evidence.

Respectfully submitted,

Dated: December 23, 2013

by: /s/ Patrick F. Bright

Patrick F. Bright, Esq.
WAGNER, ANDERSON & BRIGHT, P.C.
3541 Ocean View Blvd.
Glendale, CA 91208
Telephone: (818) 249-9300
Facsimile: (818) 249-9335
pbright@patentattorney.us
*Attorneys for Appellant Smartmetric, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system.  Participants in this case are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  December 23, 2013          /s/ Patrick F. Bright

Patrick F. Bright, Esq.
WAGNER, ANDERSON & BRIGHT, P.C.
3541 Ocean View Blvd.
Glendale, CA 91208
Telephone: (818) 249-9300
Facsimile:  (818) 249-9335
pbright@patentattorney.us

*Attorneys for Plaintiff-Appellant
SmartMetric, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 13,922 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in Times New Roman 14-point font.


Dated: December 23, 2013          /s/ Patrick F. Bright_____
                                  Patrick F. Bright
                                  *Attorney for Plaintiff-Appellant*
                                  *SmartMetric, Inc.*

**ADDENDUM**

JS-6

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMARTMETRIC INC., | Case No.: CV-11-7126-MWF (AJWx) |
| Plaintiff(s), | **JUDGMENT** |
| vs. | |
| MASTERCARD INTERNATIONAL INCORPORATED, and VISA INC., | |
| Defendant(s). | |

    On October 2, 2013, the Court granted Defendants' Motion for Summary Judgment as to Non-infringement filed by Defendants Visa, Inc. and MasterCard International, Inc. (Docket No. 174). On October 9, 2013, Defendants submitted a Request for Dismissal of Counterclaims for Declaratory Judgment of Invalidity. (Docket No. 175). Finding that good cause exists for entry of a separate judgment under Rule 54 of the Federal Rules of Civil Procedure,

    **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants Visa, Inc. and MasterCard International, Inc. shall have judgment

1  against Plaintiff SmartMetric, Inc. ("Plaintiff"), and that Plaintiff shall take

2  nothing; and

3      **IT IS HEREBY FURTHER ORDERED** that the Counterclaims for

4  Invalidity asserted by Defendants Visa, Inc. (Docket No. 25) and MasterCard

5  International, Inc. (Docket No. 29), be dismissed without prejudice, and that

6  neither Plaintiff nor Defendants are deemed a prevailing party under Rule 54 of the

7  Federal Rules of Civil Procedure and Local Rule 54-1 as to those Counterclaims.

8

9

10  Dated:  October 16, 2013

11  _____
    MICHAEL W. FITZGERALD
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9            FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11   SMARTMETRIC, INC.,                    )   Case No.: CV-11-7126-MWF (AJWx)
12                      Plaintiff(s),      )   ORDER GRANTING DEFENDANTS'
                                           )   MOTION FOR SUMMARY
13          vs.                            )   JUDGMENT AS TO NON-
                                           )   INFRINGEMENT [122], DENYING
14   MASTERCARD INTERNATIONAL,             )   PLAINTIFF'S MOTION FOR
     INC.; and VISA, INC.,                 )   SUMMARY JUDGMENT AS TO
15                                         )   INFRINGEMENT [100, 118], AND
                       Defendant(s).       )   DENYING AS MOOT MOTION FOR
16                                         )   SUMMARY JUDGMENT AS TO
                                           )   DAMAGES [119] AND MOTION
17                                         )   FOR SUMMARY JUDGMENT AS TO
                                           )   INVALIDITY [129]
18
19
20        This patent action is before the Court on three Motions for Summary
21   Judgment filed by Defendants and one Motion for Summary Judgment filed by
22   plaintiff SmartMetric. (Docket Nos. 100, 118, 119, 122, 129). Having considered
23   the parties' submissions, the Court **GRANTS** Defendants' Motion for Summary
24   Judgment as to Non-infringement (Docket No. 122), **DENIES** Plaintiff's Motion
25   for Summary Judgment as to Infringement (Docket Nos. 100, 118), and **DENIES**
26   **AS MOOT** Defendants' Motions for Summary Judgment as to Invalidity and
27   Damages. (Docket Nos. 119, 129).
28

1         In deciding these Motions under Rule 56, the Court applies *Anderson*,

2    *Celotex*, and their Ninth Circuit progeny. Fed. R. Civ. P. 56(a); *Anderson v.*

3    *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);

4    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265

5    (1986). Where, as here, "the non-moving party bears the burden of proof at trial,

6    the moving party need only prove that there is an absence of evidence to support

7    the non-moving party's case." *In re Oracle Corp. Securities Litig.*, 627 F.3d 376,

8    387 (9th Cir. 2010). The burden then shifts to the non-moving party, which may

9    not simply rely on allegations in its pleadings but must identify specific facts

10   raising a genuine dispute that will be material at trial. Fed. R. Civ. P. 56(c).

11

12   **I.    PROCEDURAL HISTORY**

13        The Scheduling Order in this matter, dated October 2, 2012, set clear

14   deadlines for expert disclosures. (Docket No. 64). Initial expert disclosures were

15   required by December 31, 2012 and rebuttal expert disclosures were required by

16   January 28, 2013. (*Id.*). SmartMetric served no expert disclosures during the

17   allotted time and did not move to further amend the scheduling order before the

18   deadlines passed. On February 7, 2013, well after the deadlines elapsed,

19   SmartMetric filed an Ex Parte Application to Continue Scheduling Order, seeking

20   a 60 day continuance of all deadlines, purportedly in light of a large document

21   production by Defendants. (Docket No. 84). The Court granted the Application

22   only in part by extending fact discovery to March 29, 2013. (Docket No. 87). All

23   other requests were denied. (*Id.* ("The Court hereby DENIES all other extensions

24   requested in Plaintiff's Application. All dates except the discovery cut-off date

25   shall remain as set forth in the Court's Order Modifying Scheduling Order filed

26   October 2, 2012.")). Motivating the Court's decision was the fact that precisely

27   ordered expert disclosures are critical to fairly conducted patent litigation.

28

1      Over a week after the Court denied SmartMetric's request to continue expert
2  disclosures, on March 1, 2013, SmartMetric served the "Infringement/Validity
3  Report from Edward L. Gussin on Behalf of Plaintiff/Counter-Defendant
4  SmartMetric Inc." ("Gussin Report"). (See Docket No. 89). SmartMetric then
5  filed a declaration in support of a Motion for Summary Judgment based on the
6  Gussin Report. (Docket No. 101). SmartMetric's Motion for Summary Judgment
7  as to Infringement was amended and re-filed pursuant to the Court's order as
8  Docket Number 118. SmartMetric attached a second, revised Declaration of
9  Edward L. Gussin in support of the amended Motion for Summary Judgment.
10  (Docket No. 118-4). While Defendants were able to depose Gussin within the
11  discovery period, their rebuttal experts did not have the benefit of his report when
12  drafting their opinions, leaving Defendants to guess about how SmartMetric would
13  attempt to prove its case.

14      Similarly, SmartMetric did not disclose a damages expert within the Court's
15  deadlines. SmartMetric served a document it contends is an expert report on
16  March 24, 2013, just five days before the fact discovery cut-off date. (See Docket
17  No. 151). The "Damages Report from Chaya Hendrick on Behalf of Plaintiff/
18  Counter-Defendant SmartMetric Inc." purports to contain an expert opinion on
19  damages as a function of a reasonable royalty rate. (Id.). Defendants urge the
20  Court to exclude both reports, preventing SmartMetric from introducing evidence
21  or testimony based on the information they contain.

22      Putting aside the substantive problems with these reports and Defendants'
23  Rule 702 objections, it is undisputed that their service was untimely. The untimely
24  disclosure of expert reports was contrary to the Court's repeated orders and likely
25  prejudiced Defendants.

26      The Court issued a Minute Order on June 19, 2013, converting the hearing
27  on the pending motions for summary judgment into a status conference to address
28  the reports and declarations because their exclusion would potentially impact the

1   Court's decision on each pending motion. (Docket No. 162).  The Court held a

2   status conference on June 24, 2013, and took the Motions under submission.  In

3   spite of this somewhat convoluted procedural history, the Court will consider the

4   substantive Motions on their merits.

5

6   **II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO**

7   **NON-INFRINGEMENT IS GRANTED ON ITS MERITS**

8       The Court **OVERRULES** SmartMetric's evidentiary objections, including

9   the objections to the Declarations of Dr. Toni Merschen, Christian Aabye, and Dr.

10  Jack Grimes.

11      After claim construction, assessing infringement involves comparing the

12  construed claims of a patent to the accused device or product.  *See, e.g., Lockwood*

13  *v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572-73 (Fed. Cir. 1997) (applying Ninth

14  Circuit procedural standards).  Specifically, each limitation from the patent in suit

15  must be present in the accused system in order to constitute literal, direct

16  infringement and the Court's analysis must take place on a limitation-by-limitation

17  basis.  *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249,

18  1253 (Fed. Cir. 2010) ("To establish literal infringement, 'every limitation set forth

19  in a claim must be found in an accused product, exactly.'" (citation omitted)).  On

20  a motion for summary judgment on infringement or invalidity, "[a]n evidentiary

21  dispute is genuine if a jury could decide the issue either way, and its verdict would

22  survive a motion for judgment as a matter of law." *Motionless Keyboard Co. v.*

23  *Microsoft Corp.*, 486 F.3d 1376, 1380 (Fed. Cir. 2007).

24      "To satisfy the summary judgment standard, a patentee's expert must set

25  forth the factual foundation for his infringement opinion in sufficient detail for the

26  court to be certain that features of the accused product would support a finding of

27  infringement under the claim construction adopted by the court, with all reasonable

28  inferences drawn in favor of the non-movant." *Intellectual Sci. & Tech., Inc. v.*

4

1    *Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009) (affirming grant of

2    summary judgment of non-infringement in favor of defendant where patentee's

3    expert did not raise a genuine issue of material fact).

4         Expert declarations that contain only conclusory allegations on the ultimate

5    legal issue are insufficient to defeat summary judgment. *See Stamps.com, Inc. v.*

6    *Endicia, Inc.*, 437 F. App'x 897, 913 (Fed. Cir. 2011) (applying Ninth Circuit

7    procedural law, conclusory expert opinion failed to raise issue of fact);

8    *Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008)

9    (finding conclusory an expert report that "merely lists a number of prior art

10   references and then concludes with the stock phrase 'to one skilled in the art it

11   would have been obvious to perform [the claimed methods]'"); *Sitrick v.*

12   *Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) (applying Ninth Circuit

13   procedural law and explaining that "[c]onclusory expert assertions cannot raise

14   triable issues of material fact on summary judgment"); *Dynacore Holdings Corp.*

15   *v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that

16   an expert's unsupported conclusion on the ultimate issue of infringement is

17   insufficient to raise a genuine issue of material fact, and that a party may not avoid

18   that rule simply by framing the expert's conclusion as an assertion that a particular

19   critical claim limitation is found in the accused device."); *Aspex Eyewear, Inc. v.*

20   *Concepts in Optics, Inc.*, 111 F. App'x 582 (Fed. Cir. 2004) ("[S]ummary

21   judgment could not have been granted without expert testimony ***clearly explaining***

22   how each claim element is disclosed in the Madison invention." (emphasis

23   added)); *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir.

24   2002) ("[In the Ninth Circuit, t]ypically, testimony concerning anticipation must be

25   testimony from one skilled in the art and must identify each claim element, state

26   the witnesses' interpretation of the claim element, and explain in detail how each

27   claim element is disclosed in the prior art reference.").

28

1    United States Patent No. 6,792,464 (the "'464 Patent") has two independent

2    claims, Claims 1 and 14.  SmartMetric fails to show a genuine issue of material

3    fact whether at least two limitations found in those Claims are present in the

4    accused systems – the requirements of local access numbers and databases of

5    access numbers.

6    Claim 1 teaches a "computer system" with an "application program" that

7    provides, in part, "access to one of the plurality of network service providers

8    via . . . *a local access number* from *a database containing a list of access*

9    *numbers* [f]or the plurality of network service providers *along with corresponding*

10   *location information for each access number in the list*." ('464 Patent at 10:18-

11   47, emphasis added).  Claim 14 teaches a "method" that involves "configuring an

12   application program . . . to gain access to one of the plurality of network service

13   providers via . . . *a local access number* from *a database containing a list of*

14   *access numbers* for the plurality of network service providers *along with*

15   *corresponding location information for each access number in the list*." ('464

16   Patent at 11:32-50, emphasis added).  Defendants argue that SmartMetric has not

17   and cannot show that these limitations are present in the accused systems.

18   In their Motion, Defendants offer evidence that "[a]t no step of the

19   transaction does the cardholder's geographic location matter." (Mot. at 7; *see also*

20   *id.* at 12-16; Aabye Decl. ¶ 11).  Nor do the accused systems include a database

21   containing local access numbers with corresponding location information. (Mot. at

22   16-19; Aabye Decl. ¶ 11; Grimes Decl. ¶ 9-11).  Defendants also offer evidence

23·  that their systems for processing transactions in place of off-line banks ("stand-in

24   processing") do not rely on the geographic location of the cardholder or the

25   merchant or utilize access numbers tethered to geographic locations found in a

26   database. (Mot. at 8; Aabye Decl. ¶ 11-12; Grimes Decl. ¶ 9-11).

27   To refute this evidence, SmartMetric offers speculative conclusions by

28   Gussin presuming these elements can be reasonably inferred to exist in the accused

1  systems.  Most of the relevant analysis emerges from the Gussin Declaration,

2  which improperly added analysis not present in the Gussin Expert Report or

3  inferable from it, functionally supplementing the Gussin Report in violation of the

4  Court's orders.  Even considering the analysis in the Declaration, Gussin's

5  presumptions lack foundation in facts.  Gussin's deposition testimony reveals that

6  these presumptions as they pertain to use within the United States (the only

7  possible subject of a U.S. patent action) are not based on any examination or

8  testing of the accused systems.  When specifically called at his deposition to

9  describe or elaborate on his conclusion that the documents he relied on display

10 each limitation in a single Visa or MasterCard system, Gussin declined to do so.

11 (*E.g.*, Gussin Dep. at 149-50 ("Q: [W]hy did you provide this EMV document in

12 support of your allegations that Visa infringes claim 1 of the '464 patent?  A: This

13 was one of the documents that was provided by Visa.  Q: Any other reason?  A: It

14 appears to be a good representation of how the system is described.  Q: Of which

15 system?  A: The Visa system.")).

16         Instead, his "inferences" that these limitations are present seem, to this

17 Court, to be guesses about how EMV systems could plausibly work.  (Gussin Decl.

18 ¶ 19).  For instance, Gussin admits that none of the thousands of documents he

19 reviews makes any mention of a database of local access numbers (which,

20 according to the Court's Claim Construction Order, must relate to the locale of the

21 user at the time of access (*see* Docket No. 65 at 12)).  (Gussin Decl. ¶ 19).  In the

22 absence of evidence of local access numbers in any Visa or MasterCard system,

23 Gussin asserts that the Defendants' "stand-in processing" systems "clearly route

24 transaction authorization requests through the Visa and MasterCard networks to

25 processing assets other than the default processor." (*Id.*).  This routing process

26 would likely include "a list of routing addresses which must be stored in a database

27 in order for the router to know where to route the requests to." (*Id.*).  But the

28 Declaration does not describe the stand-in processing systems in any detail, nor

7

1   does the Declaration explain (as an expert must do in order to defeat summary

2   judgment) how the documents Gussin cites show that the stand-in processing

3   systems employ a database of local access numbers.

4       Gussin's omission to provide sufficient detail is especially worrisome when

5   Defendants have presented evidence that Gussin's inferences do not, in fact,

6   describe how Defendants' systems actually work. (Reply at 8). Gussin infers that

7   the stand-in processing system would likely route a user's request "to a center

8   geographically close to the POS, ATM or other card-initiated transaction."

9   (Gussin Decl. ¶ 19). Defendants have provided the testimony of a fact witness

10   familiar with Visa's system who testified that "the locale of the cardholder is

11   immaterial to the Visa System." (Aabye Decl. ¶ 11). On a Motion for Summary

12   Judgment, once the Defendants have sufficiently shown that no evidence exists on

13   which the Plaintiff can carry its burden of proof at trial, the burden shifts to the

14   Plaintiff to show that a genuine issue of material fact exists. *See Matrix Motor Co.*

15   *v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1087 (C.D. Cal. 2003)

16   ("[A] plausible scenario cannot counter direct evidence offered in support of a

17   motion for summary judgment." (citing *Swanson v. Leggett & Platt*, 154 F.3d 730,

18   733 (7th Cir. 1998))). Without some specific guidance as to why he believes

19   Aabye's Declaration to be false, Gussin's inferences are nothing more than guesses

20   that do not counter Aabye's testimony and do not raise a genuine issue of material

21   fact.

22       Gussin fails even to describe *which* of Defendants' systems Plaintiff refers to

23   in its infringement analysis. The Gussin Declaration merely states in separate

24   paragraphs that each claim of the '464 Patent is infringed and lists Bates Numbers

25   and short, abstruse descriptions of documents purportedly supporting that

26   contention. (Gussin Decl. ¶¶ 4-16). But it is not even clear which of Defendants'

27   devices or products the Declaration references because Gussin only generically

28   identifies Defendants' "EMV Systems." (*E.g.*, *id.* ¶ 18). It appears that Gussin

1  refers to Defendants' payment systems generally, as he has never examined or
2  tested Defendants' accused systems (let alone identified them with any specificity).
3  In his deposition, Gussin stated both that he didn't know which of the documents
4  he cited referred to systems that were actually in use, and that he hadn't engaged in
5  any testing of the systems.  (Gussin Dep. at 128:1-9 ("Q: Are you aware of any
6  uses of the technology described in the documents that you reviewed? . . . A: I
7  believe that the documents accurately describe how the Visa system works.  If they
8  were produced in response to a request in this case, I would assume that Visa sent
9  accurate representation of their system."); *id.* at 129:16-20 ("Q: [D]id you do any
10  actual testing of the Visa system . . . ? A: No.  I did not do any testing of the
11  system.")).

12      Beyond Gussin's apparent unfamiliarity with the systems at issue, his failure
13  to identify a specific product or system with each limitation of the '464 Patent
14  belies the notion that each feature appears in a *single system,* as required by the
15  black-letter law of patent infringement.  *See, e.g., Builders Concrete, Inc. v.*
16  *Bremerton Concrete Products Co.,* 757 F.2d 255, 257 (Fed. Cir. 1985) ("Literal
17  infringement requires that *the accused device embody every element of the claim.*"
18  (emphasis added)).  If a patentee owns a patent that claims attaching an eraser to a
19  pencil, there is no literal infringement with the mere showing that an accused
20  infringer has, at certain times in the past, possessed and used both pencils and
21  erasers.  The patentee must point the court to a single device in which both of the
22  claim's limitations are met.  Plaintiff here has not done so.

23      Instead, Gussin has only listed fragmentary documents for the Court that he
24  suggests display the Defendants' use of each limitation in Claims 1 and 14 of the
25  '464 patents.  He has not shown that either Defendant has integrated these various
26  devices, processes, and techniques into a system that literally infringes the patent.
27  The documents that Gussin identifies have widely divergent dates; some were
28  created in 1996, some in 2012, and several in between.  Some of the documents

9

1  Gussin identifies are dated before the '464 Patent issued, and there are certain
2  limitations of the '464 Patent, like the local access number and database, that do
3  not appear at all.  Some of the documents refer to systems that were found to be
4  non-infringing in the prior case (the Honorable Jacquelyn H. Nguyen, then-United
5  States District Judge), specifically, the contactless card payment system.  And
6  Gussin assumes, without any identifiable factual basis, that documents describing
7  the contactless systems would have counterparts in the contact system.  (Gussin
8  Dep. at 151:14-18).  Given that Gussin personally reviewed the thousands of
9  produced documents, many of which pertain specifically to the contact system, this
10 assumption seems rather incredible.

11      Hendrick's Report fares no better.  At her Rule 30(b)(6) deposition,
12 Hendrick conceded that her damages analysis was not based on any documents
13 from Defendants.  She testified that she has never served as a damages expert, she
14 has never participated in a license or royalty negotiation, she has never qualified as
15 an expert, and she has never heard of the applicable standard for assessing the
16 reasonability of a royalty.  Her company, SmartMetric, does not practice the '464
17 Patent.  The opinions she offers are therefore conclusory and lacking foundation.

18      This Motion is also properly granted on the basis that Defendants do not
19 make, use, or sell infringing devices, as required for a finding of infringement.  For
20 a system claim, direct infringement requires that "a party must put the invention
21 into service, *i.e.*, control the system as a whole and obtain benefit from it."
22 *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284
23 (Fed. Cir. 2011).  Control is defined as "the ability to place the system as a whole
24 into service" by "using all portions of the claimed invention."  *Id.*  It is undisputed
25 that the Defendants do not themselves issue smartcards, manufacture, configure, or
26 otherwise control smartcard readers, insert smartcards into readers or interact
27 directly with cardholders, or engage in any other function ascribed in consumer
28 transactions to the cardholder or the merchant.

1    The Gussin Declaration points to documents produced by the Defendants
2    that *describe* cards and card readers (*see* Gussin Decl. ¶¶ 6-7), but it does not
3    sufficiently show that Defendants *control* the cards and card readers, as required
4    for literal infringement under Federal Circuit precedent. *Centillion Data Sys.*, 631
5    F.3d at 1284 (holding that an alleged infringing telecommunications company,
6    which admittedly put into practice certain back-end processing functions of a
7    system claim, did not "use" an entire system in part because individual front-end
8    users controlled their own activity in accessing the system). For this reason,
9    Defendants cannot be found to "use" the systems that purportedly infringe on
10    Claim 1, and they cannot be held liable for direct infringement as a result.

11    The parties contest whether Defendants' specific "use" of the method in
12    Claim 14 is sufficient to give rise to liability assuming the existence of literal
13    infringement by the accused systems. For a method to directly infringe on a patent
14    in suit, "the accused infringer must perform all the steps of the claimed method,
15    either personally or through another acting under his direction or control." *Akamai*
16    *Tech. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir. 2012) (applying
17    vicarious liability only when act is committed by accused infringer's agent or some
18    equivalent relationship, even if the division of infringing activity was intended to
19    avoid liability). SmartMetric has failed to show that the merchants, cardholders,
20    and various banks involved in the EMV transactions act under Defendants'
21    direction or control. Defendants cannot be found to "use" a method that infringes
22    Claim 14, and they cannot be held liable for direct infringement as a result.

23    Because Defendants cannot be found to infringe independent Claims 1 and
24    14 of the '464 Patent on the record before the Court, they cannot be found to
25    infringe any of the dependent claims. *See Jeneric/Pentrol, Inc. v. Dillon, Co.*, 205
26    F.3d 1377, 1383 (Fed. Cir. 2000) ("[A] dependent claim, by nature, incorporates
27    all the limitations of the claim to which it refers.").
28

1    In sum, all these issues ineluctably point to the conclusion that the parties

2  here are comparing apples and oranges.  The piecemeal similarities that

3  SmartMetric has identified in support of its claims do not change the fact that

4  Claims 1 and 14 of the '464 patent are simply not practiced by Defendants, and no

5  reasonable jury could conclude otherwise.

6    Accordingly, summary judgment in Defendants' favor is **GRANTED** on the

7  question of non-infringement.  Plaintiff's Motion for Summary Judgment as to

8  Infringement is **DENIED** for the same reasons.  Defendants' other Motions for

9  Summary Judgment are **DENIED AS MOOT**.

10

11  **III.    IT WOULD ALSO BE AN APPROPRIATE EXERCISE OF THE**

12  **COURT'S DISCRETION TO STRIKE THE GUSSIN AND**

13  **HENDRICK REPORTS, PRECLUDING USE OF THEIR**

14  **TESTIMONY IN SUPPORT OF THE MOTIONS AND AT TRIAL,**

15  **PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(C)(1)**

16    Federal Rule of Civil Procedure 37(c)(1) provides that no party may rely on

17  untimely disclosed witnesses or evidence unless the nondisclosure was

18  substantially justified or harmless.  Exclusion of evidence is intended to be the

19  sanction that gives meaning to the Court's scheduling orders, and the burden is on

20  the party facing sanctions to show that the late disclosure was either substantially

21  justified or harmless.  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

22  1101, 1107 (9th Cir. 2001) (affirming exclusion of expert testimony).  The Federal

23  Circuit reviews exclusions of evidence under the law of the regional circuit.  *See,*

24  *e.g.*, *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358 (Fed. Cir. 2011) (applying

25  Ninth Circuit law and finding the district court did not abuse its discretion by

26  excluding late-disclosed expert declarations when deciding summary judgment

27  motions).

28

1       The Ninth Circuit affords "particularly wide latitude to the district court's

2   discretion to issue sanctions under Rule 37(c)(1)." *Yeti by Molly*, 259 F.3d at

3   1106. This latitude remains even when exclusion is highly prejudicial to a party's

4   claim. *Jarritos v. Reyes*, 345 F. App'x 215, 217 (9th Cir. 2011) (affirming

5   exclusion of evidence that was "central" to a plaintiff's claim and therefore "highly

6   prejudicial"). Although certain Ninth Circuit authority indicates that such

7   sanctions are proper even where they functionally, albeit not directly, dispose of a

8   claim, *see Yeti by Molly*, 259 F.3d at 1106 (upholding decision to exclude evidence

9   where it made proof of a claim "much more difficult, perhaps almost impossible"),

10  one recent decision held that where exclusion is tantamount to dismissal, the

11  district court must "consider whether the claimed noncompliance involved

12  willfulness, fault, or bad faith" and must also consider the availability of lesser

13  sanctions, like a continuance. *R & R Sails v. Insurance Co. of Pa.*, 673 F.3d 1240,

14  1247 (9th Cir. 2012) (reversing and remanding because district court did not make

15  such a finding). The Federal Circuit has not yet relied on *R & R Sails*, which is not

16  a patent case.

17      SmartMetric has not shown that its failure to disclose either expert report

18  was substantially justified or harmless. The late disclosures were not substantially

19  justified because neither expert exclusively or even primarily relies on documents

20  that were unavailable to SmartMetric prior to the expert disclosure deadline. Nor

21  do the reports or SmartMetric's papers attempt to explain why any unavailable

22  document was critical to an opinion offered.

23      Ordinarily, the Court would not belabor this point, especially in a case – as

24  here – where the Court chose to reach the merits in any event. In this patent case,

25  however, it is important to note the importance of the expert deadlines. Treatises

26  describe patent cases as games of chicken, with each side preferring to tailor its

27  strategy to the arguments of its opponent. *See, e.g.*, James A. Amend, *Patent Law:*

28  *A Primer for Federal District Court Judges* 6 (1998) ("Once it is recognized that

13

1   patent cases principally involve conflicting contentions and not fact disputes, an

2   important cause of judicial frustration becomes clearer. *Neither party wants to*

3   *disclose its contentions first.*"). As a solution, the treatises propose strictly ordered

4   discovery to prevent one side from dodging its disclosure responsibilities and

5   thereafter benefitting from its recalcitrance. Specifically, certain treatises suggest

6   that each party must serve expert disclosures on the issues for which it bears the

7   burden of persuasion of trial, and "any issue not addressed in the Opening Expert

8   Report is waived insofar as expert testimony is concerned." *Id.* at 29.

9         SmartMetric had the benefit of Defendants' reports in commissioning its

10  own experts and did not serve its reports until a time when Defendants were

11  hamstrung by the Scheduling Order. This bell cannot be unrung. Because of

12  SmartMetric's conduct, Defendants' steadfast compliance with Court orders was to

13  their detriment.

14        Moreover, under Federal Circuit precedent, excluding the Hendrick Report

15  alone would not be tantamount to dismissal of SmartMetric's claims. If the Court

16  were only to exclude the Hendrick Report, the *R & R Sails* factors appear to be

17  inapplicable. In *Dow Chemical v. Mee Industries*, 341 F.3d 1370 (Fed. Cir. 2003),

18  the Federal Circuit held that the exclusion of testimony of a patentee's damages

19  expert did not preclude an award of reasonable royalty damages that could

20  otherwise be supported by the record. *Id.* at 1381 (district court must award no less

21  than a reasonable royalty as supported by the record upon a finding of

22  infringement). *Dow Chemical* explains that the district court ***must*** award damages

23  in the form of a reasonable royalty, and the failure of a plaintiff to present evidence

24  *only* undermines the plaintiff's ability to challenge the award given. *Id.* at 1382

25  ("[T]he district court's obligation to award some amount of damages does not

26  mean that a patentee who puts on little or no satisfactory evidence of a reasonable

27  royalty can successfully appeal on the ground that the amount awarded by the court

28  is not 'reasonable.'"); *see also Bos. Scientific Corp. v. Johnson & Johnson*, 550 F.

1  Supp. 2d 1102, 1120-21 (N.D. Cal. 2008) (awarding zero damages after trial in
2  light of patentee's failure to put on evidence); *Monolithic Power Sys., Inc. v. O2*
3  *Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1156 (N.D. Cal. 2007) (granting summary
4  adjudication of zero damages).

5      Applying this reasoning, exclusion of a damages expert would not end any
6  claims, and would therefore not trigger application of *R & R Sails*.

7      Accordingly, even if the Court had not granted the Motion for Summary
8  Judgment as to Non-infringement on its merits, the Court would have had the
9  discretion to strike SmartMetric's expert reports and reach the same ruling. The
10 objections of Defendants are **OVERRULED AS MOOT** but if reached would
11 have been valid.

12

13 **IV.  ENTRY OF FINAL JUDGMENT**

14      At the September 25, 2013 hearing on this matter, counsel for the
15 Defendants indicated that the Defendants would withdraw their counterclaims
16 against Plaintiff upon the issuance of an order granting them summary judgment of
17 non-infringement. The Defendants should submit a request for voluntary dismissal
18 of their counterclaims pursuant to Federal Rule of Civil Procedure 41(a). The
19 Court will enter final judgment on this matter upon receipt of the Defendants'
20 request.

21

22      IT IS SO ORDERED.

23

24

25 Dated:  October 2, 2013

26                                         _____
                                           MICHAEL W. FITZGERALD
27                                         United States District Judge
28

US006792464B2

(12) **United States Patent**
Hendrick

(10) Patent No.: **US 6,792,464 B2**
(45) Date of Patent: **Sep. 14, 2004**

(54) **SYSTEM FOR AUTOMATIC CONNECTION TO A NETWORK**

(76) Inventor: **Colin Hendrick**, 289 Kingston Ave., Brooklyn, NY (US) 11213

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 625 days.

(21) Appl. No.: **09/784,851**

(22) Filed: **Feb. 15, 2001**

(65) **Prior Publication Data**

US 2001/0025878 A1 Oct. 4, 2001

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US00/04250, filed on Feb. 18, 2000.

(30) **Foreign Application Priority Data**

Feb. 18, 1999 (AU) .............................................. 17394/99

(51) Int. Cl.⁷ ............................................... G06F 13/00
(52) U.S. Cl. ..................................... 709/227; 709/217
(58) Field of Search ................................... 709/200, 201, 709/203, 217, 218, 219, 220, 221, 222, 223, 224, 227

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,880,769 A | * | 3/1999 | Nemirofsky et al. | 725/139 |
| 5,995,105 A | * | 11/1999 | Reber et al. | 345/835 |
| 6,334,109 B1 | * | 12/2001 | Kanevsky et al. | 705/14 |
| 6,359,699 B1 | * | 3/2002 | Yoneta et al. | 358/1.16 |
| 6,385,729 B1 | * | 5/2002 | DiGiorgio et al. | 713/201 |
| 6,609,658 B1 | * | 8/2003 | Sehr | 235/384 |

* cited by examiner

*Primary Examiner*—Moustafa M. Meky
(74) *Attorney, Agent, or Firm*—Cooper & Dunham LLP

(57) **ABSTRACT**

A computer system (10) that allows a user to automatically access one of a plurality of Internet Service Providers which require information specific to the user and/or the ISP (12) to be accessed. A smart card (14) contains the information specific to the user and/or the ISP (12) to be accessed, and a smart card reader (18) reads the information contained on the smart card (14) when inserted into the recess 16 of the smart card reader (18). A computer (24) is provided having a Central Processing Unit CPU (22) that is in communication with the smart card reader (18) and which is also adapted to be connected to the ISP (12) via telephone line (30). An application program (26) resides on the CPU (22) and is configured to automatically retrieve the information contained on the smart card (14) when it is inserted into the smart card reader (18) and to use that information to gain access to one of the plurality of ISPs via the network by using one of a default access number indicating a designated ISP (12) and a local access number from a database (28) containing a list of access numbers for the plurality of ISPs along with corresponding location information for each access number in the list. The computer system (10) may further comprise an online advertising server (82) for serving advertisement information to the user based on profile information of the information specific to the user contained on the smart card (14).

**25 Claims, 7 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3



**Fig. 4**



Fig. 5



Fig. 6



Fig. 7

US 6,792,464 B2

1

# SYSTEM FOR AUTOMATIC CONNECTION TO A NETWORK

This application is a continuation of PCT International Application No. PCT/US00/04250, filed Feb. 18, 2000, designating the United States of America, which claims priority of Australian Application No. AU 17394/99 (PP9281), filed Feb. 18, 1999, the contents of which are hereby incorporated by reference into the present application.

## TECHNICAL FIELD

The present invention relates to a computer system that allows a user to automatically connect to a network service provider, and more particularly, to a system and method which allows a user to automatically connect to a network service provider by using a data card (i.e., a "smart card"). A smart card is a card that is approximately the size of a credit card and stores electronic data on a microchip for use in a variety of applications. The present invention also relates to an online advertisement system that accesses user profile information stored on a smart card to provide advertisements specifically tailored to the user's profile.

## BACKGROUND ART

With the increasing use of information technology to access and exchange information over a network, in addition to the emergence of commercial transactions which have been taking place over open networks such as the internet, it has become necessary to store information (particularly about a user) in a secure manner. One method of securing information is by a smart card. A smart card is approximately the size of a conventional credit card; however, instead of having a magnetic strip which stores data on the card, smart cards usually have a microchip embedded within their structure. The microchip stores information in the form of electronic data which may be of use to the smart card user.

Essentially, smart cards can be categorized into two distinct types, namely "contact smart cards" and "contactless smart cards." Smart card readers are devices that read information contained in a smart card microchip. They are typically connected to a computer so that information in the smart card chip can be relayed to the computer.

"Contact" smart cards are typically inserted into a smart card reader. These cards have a microchip on one side of the card which makes contact with an electrical connector contained within the smart card reader. Data is exchanged between the chip on the smart card and the electrical connector of the smart card reader.

"Contactless" smart cards do not have an exposed chip on one side of the card, but have an antenna embedded within the card itself. The antenna transmits information to a coupler unit or "smart card reader" which is also fitted with an antenna. The antenna allows information to be exchanged without physical contact having to be made between the smart card chip and the smart card reader.

Typically when a smart card is inserted into a reader mechanism, the embedded chip transmits a message to the host machine on which the reader is attached. This message typically acknowledges card insertion into the reader mechanism.

Existing applications that utilize the smart card are launched by a human user after the smart card is inserted or before the smart card is inserted. In the general case of application launch before card insertion a prompt within a

2

typical application requires users to insert and then acknowledge card insertion through a prompt. In the general case of application launch after card insertion a similar acknowledgment is also required.

Internet Service Providers (ISPs) or Internet Access Providers (IAPS) are companies that provide individuals and companies with access to the internet and to other related services, such as website building and hosting. A user of an internet service typically accesses the ISP from his or her computer via a telephone line so as to gain access to the internet. The ISP usually requires the user to enter particular information in relation to the user, such as a login name and password which is then checked against the ISP's database to verify that the user is registered with the ISP. Traditionally ISPs have been located within their own regional areas and therefore the user typically dials a local number to access the ISP.

Problems can occur when the user uses his or her computer to log on to the ISP (e.g., such as on a business trip using a laptop computer) and the number recorded in the computer for the ISP may be different (i.e., different area and/or country code). It is then necessary for the user to enter in the area code (or country number if he or she is overseas) for the ISP and pay for a long distance call. Alternatively, the same ISP may have a local number within the particular locale in which the user is located at a particular time. However, the user typically has to physically search for the local ISP number in the particular locale in which he or she is located. Furthermore, delays in the time it takes for a user to access the internet can result whenever the user is in a different geographic location or happens to use a different computer.

Moreover, there is a need for a simple way to provide advertisements to a user which are specifically directed to that user's tastes and characteristics.

## DISCLOSURE OF INVENTION

The present invention is directed to overcoming the problems in the prior art regarding the inconvenience of the user having to physically search for the local ISP number in the particular locale in which he or she is located, or the increased cost in paying for a long distance call if this search is not performed, or the delays in time it takes for a user to access the internet when the user is in a different geographic location or happens to use a different computer.

The present invention is also directed to an online advertisement system that accesses user profile information stored on a smart card to provide advertisements specifically tailored to the user's profile.

According to one embodiment of the present invention, there is disclosed a computer system for allowing a user to automatically access one of a plurality of network service providers which require information specific to the user and/or the network service provider to be accessed, the computer system comprising:

a data card which contains the information specific to either the user and/or the network service provider to be accessed;

a data card reader adapted to access at least part of the information contained on the data card when the data card is in communication therewith;

a data processor in communication with the data card reader and adapted to be connected to a network;

an application program resident on the data processor, the application program being configured to automatically retrieve at least part of the information contained on the

3

data card when the data card is in communication with said data card reader and to use the information to gain access to one of the plurality of network service providers via the network by using one of a default access number indicating a designated network service provider and a local access number from a database containing a list of access numbers for the plurality of network service providers along with corresponding location information for each access number in the list,

wherein the application program is immediately triggered upon insertion of the data card into the data card reader.

The data card typically comprises a microprocessor for processing the information stored within the data card, a memory component which enables the information to be stored within the data card and a communications interface for transferring the information from the data card to the data card reader.

The communications interface may include an antenna embedded inside the data card so as to communicate the information between the data card and the data card reader. In such an embodiment, the data card reader also has an antenna embedded inside so as to receive/relay information from/to the data card.

Alternatively, the communications interface may include a contact connector and the data card reader may include electrical connectors so that information can be received/relayed from/to the data card when the contact and the electrical connectors are in physical contact. The communications interface of the data card may make contact with a communications interface located on the data card reader. In some embodiments of the invention, the data card is a smart card and the data card reader is a smart card reader. The data card may also contain a battery for storage of power received from the data card reader when it is connected thereto.

Preferably, the data card is inserted into a recess provided within the data card reader. Typically, when the data card is inside the data card reader, the electrical connectors on the data card reader detect that a data card is inserted in the data card reader and an activation code is generated by the microprocessor and is sent to the data processor. The activation code is then sent to the application program.

When the activation code is received by the data processor, the application program instructs the CPU to generate a code to establish a link with the network service provider by instructing a modem to dial a default number to access the network service provider via the network. Hence, by inserting the smart card into the smart card reader, a connection is automatically established with the network service provider. The default number may be the number of a network service provider local to the user. If the dial-up sequence is via a network such as a telephone line, the phone number of the network service provider may be part of the specific information contained on the data card.

If the user is located in another city or indeed in another country, there will be a different country and area code required and the number dialed by the application program will not connect to the network service provider. In such a situation, the application program will also include a logic code which determines that a connection has not been made and shall generate a message to the user requesting that they input the country and/or the city in which they are currently located.

Optionally, the application program may contain a database detailing a list of the countries, the associated locale by area codes within those countries and may also include a list of network service providers within each country and local

4

area location. In some embodiments of the invention, the message generated by the application program may generate from the database, the list of countries on a graphical display. Typically the user will then select the country he or she is located in at a particular time. Once the country is selected, the application may then generate from the database, a list of locales by area code associated with the selected country. The user then selects the locale in which he or she is located. The application program then notes the locale and retrieves from the database, the country code and/or the area code of the location.

Alternatively, the database may be stored on a memory means such as a compact disc read only memory (CD ROM) accessible by the data processor. Or, the database may be stored in a remote server accessible by the data processor.

In one embodiment, once the application program knows the locale of a user, the number of the nearest network service provider located in the locale is dialed by the data processor via the modem. In other embodiments, the user may have a designated network service provider and the application program then dials the number of the designated network service provider and the appropriate country and area code. Optionally, the application program may provide the user with a choice as to whether they wish to use their designated network service provider or a network service provider in their present locale. Furthermore, the application program may provide the user with a choice of network service providers from which to choose in a particular location.

Typically, the network service provider is an Internet Service Provider (ISP) or an Internet Access Provider (IAP) which provides internet services to the user. Alternatively, the network service provider might be a proxy server of an intranet.

The network which the user uses to access the ISP does not have to be a telephone line but can be any sort of telecommunications network such as a telecommunications cable or telephony.

In some examples of the invention, the specific information contained on the data card includes the user's login identification and password which is required to access the ISP. The specific information may, however, contain other pieces of information, such as verification codes or encrypted data relating to the user's finances or network preferences. This information can be used, for example, in the embodiment of the invention described in detail below wherein an online advertisement system accesses user profile information stored on a smart card to provide advertisements specifically tailored to the user's profile. This information may be inputted by the user upon initial use of the data card by having the user fill out a series of information fields. The personal information may then be encrypted and stored on the data card.

In some embodiments of the invention, the data processor is preferably a personal computer which includes or is connected to a modem which can access the internet. In other embodiments of the invention, the data processor may be housed within the data card reader, which may also include a graphical interface for the user to view information contained on the network.

According to another aspect of the present invention, there is disclosed a method for allowing a user to automatically access one of a plurality of network service providers which require information specific to the user and/or the network service provider to be accessed, comprising the steps of:

configuring an application program resident on a data processor to automatically retrieve at least part of the infor-

US 6,792,464 B2

5

mation specific to the user and/or the network service provider to be accessed contained on a data card when the data card is in communication with a data card reader and to use the information to gain access to one of the plurality of network service providers via a network by using one of a default access number indicating a designated network service provider and a local access number from a database containing a list of access numbers for the plurality of network service providers along with corresponding location information for each access number in the list; and

immediately triggering the application program upon insertion of the data card into the data card reader.

In another embodiment of the present invention, an online advertisement system provides advertisements to a user that are specifically tailored to the user's profile. The online advertisement system comprises:

a data card for storing information specific to the user, including user profile information;

a data card reader for accessing the information contained on the data card when the data card is in communication therewith;

a data processor in communication with the data card reader; and

an online advertising server connected to the data processor for serving the advertisements to the user, wherein the advertisements are specifically tailored to the user based on the user profile information.

In another embodiment of the present invention, a data card is provided for allowing a user to automatically access one of a plurality of network service providers, comprising:

a memory for storing information specific to the user and/or the plurality of network service providers and for storing an application program which is immediately triggered and which automatically uses the information to access one of the network service providers via a network when the data card is in communication with a data card reader that is communicating with a data processor.

In another embodiment of the present invention, a method is provided for automatically transferring information to a network, comprising the steps of storing the information on a data card, connecting to the network, and automatically uploading the information stored on the data card to the network upon connection thereto.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 shows the logic for the smart card application trigger process;

FIG. 2 shows a trigger process wherein the application trigger polls a variable;

FIG. 3 shows an embodiment of the computer system in accordance with the present invention;

FIG. 4 shows an embodiment of the data card which is used in the data card reader of FIG. 3;

FIG. 5 shows in more detail the data card reader of FIG. 3;

FIG. 6 shows a number of stages which the system uses to connect a user automatically to the internet, in accordance with the present invention; and

FIG. 7 shows a system including a remote server for serving specific advertisements to the user.

## BEST MODE FOR CARRYING OUT THE INVENTION

It is to be understood that the invention disclosed and defined herein extends to all alternative combinations of two

6

or more of the individual features mentioned or evident from the text and drawings. All of these different combinations constitute various alternative aspects of the invention.

The foregoing describes embodiments of the invention, and modifications obvious to those skilled in the art can be made thereto without departing from the scope of the present invention.

FIG. 1 shows the logic for the smart card application trigger process. This diagram describes how a host application is launched upon insertion of the smart card. There are many different possible host applications. For example, the application trigger process could be used to access data sources through a network, launch local and remote applications for a particular user, boot a computing device, restrict access to computing platforms, allow entry into building facilities, or start a combustion or non-fossil engine.

As shown in FIG. 1, upon system and/or detection software power-up, boot, or reset as denoted by Start 86, the system moves to the trigger detection step 88 to wait for insertion of the smart card. Upon insertion of the card, data representing card insertion is sent to the trigger detector to be detected by the trigger detection step 88. Once the trigger is detected (i.e., the smart card is inserted), the application trigger 90 causes the host application to be launched.

FIG. 2 shows an alternative method for launching a host application upon insertion of the smart card. In FIG. 2, the trigger detection process is a continually running process that detects card insertion through smart card access attempts. The application trigger 94 polls an O/S boolean variable that is set to either true or false upon trigger detection. Upon detecting the appropriate true/false value of the variable denoting insertion of the smart card, the application trigger 94 launches the application 96.

The launched application can be stored on the smart card itself, and the trigger detector and application trigger can be integrated into the same module. For example, upon trigger detection an application may be launched on the card by the application trigger logic to perform authentication processes on the smart card. Authentication is the verification of user identity through a personal identification number (PIN) stored on the host machine. For example, the application launched by the application trigger process may ask for a PIN from the user. To avoid this step, the user could store his or her PIN on the host machine. The trigger detector would then read data from a file with the stored PIN before starting the application trigger to verify the PIN. Alternatively, the PIN reading application could be launched as normal without prompting the user for a PIN but instead reading the PIN number from a file.

This process is distinguishable from the process used by magnetic strip reading automated teller machines (ATMs) since there is no embedded-chip present in such devices. ATMs are mechanical devices that perform a reading operation when a mechanical latch or switch movement is detected upon card insertion.

Next, the part of the system relating to automatic connection to a network according to the present invention will be described. Referring to FIG. 3, there is shown a computer system 10 which allows a user to automatically access a network service provider in the form of ISP 12. The ISP 12 requires the user's login identification and a password before the ISP 12 will provide access to the internet. This information is contained on a data card in the form of smart card 14 shown in FIG. 3 as being located within recess 16 that is within a data card reader in the form of smart card reader 18.

7

Upon first use of the smart card 14, the user may be required to input his or her personal information into the system using, for example, a series of information fields. This information is then encrypted and transferred onto the smart card 14.

The smart card reader 18 is adapted to read the login and password information for the ISP 12 that is contained on smart card 14. The smart card reader 18 is connected via cable 20 to a data processor in the form of central processing unit (CPU) 22 located within computer 24 (shown in this example of the invention by broken lines).

An application program 26 is resident in the memory of the computer 24, and contains code that allows the information contained on the smart card 14 to be processed by the CPU 22. The application program 26 is able to access information contained in a database 28, which stores information relating to the ISP 12 as well as a number of other ISPs which are located in different locales. The database 28 may be stored on a CD ROM or on a remote server, for example. The application program 26 may be configured to either dial a default access number previously stored on the smart card 14, or to read the area code from the smart card 14 and then dial a number from the database closely corresponding thereto. If there is no connection, a prompt asks the user to input the number to be dialed.

The computer 24 is also connected to a user graphical display in the form of monitor 32, which can display to the user information contained on the smart card 14 and information which is downloaded from the ISP 12. The computer 24 also contains a modem 34 which establishes a link with ISP 12 via a network in the form of telephone line 30.

Referring now to FIG. 4, there is shown a cross-sectional view of the smart card 14. The smart card comprises a microprocessor 36 which can process information contained on the smart card 14, a memory component in the form of memory chip 38 which stores the information within the data card, a power source in the form of battery 40 which provides power to the microchip so that it can process information, and a communications interface in the form of contact connector 42. The contact connector 42 is exposed to the surface of one side of the smart card 14.

Referring now to FIG. 5, there is shown the smart card reader 18 with the recess 16 shown by broken lines. On one side of the smart card reader 18 there is provided an electrical connector 44 which is adapted to make contact with the contact connector 42 whenever the smart card 14 is inserted into recess 16.

Referring now to FIG. 6, there is shown the steps for one typical method of the computer system according to the present invention, which will now be described in detail with reference also to FIGS. 3, 4, and 5. When a user wishes to connect to the ISP 12 in order to access internet services such as the World Wide Web or internet mail service, the user inserts smart card 14 into recess 16 of the smart card reader 18. The electrical connector 44 detects that the smart card 14 is within the smart card reader 18 when the contact connector 42 makes physical contact with electrical connector 44. In this example of the invention, an activation code is generated by the microprocessor 36, which is then sent to the CPU 22 via cable 20. The CPU then relays this initiation code to the application program 26. The first stage of this process can be seen as step 46 of FIG. 6.

Initially, the database is stored with the default telephone number of ISP 12 as a default so that the application program 26 automatically instructs the modem 34 to dial the telephone number of the ISP 12. The application program 26

8

then initiates a request code, requesting information relating to the login of the user for the ISP 12 from the smart card 14. The information from smart card 14 is then transferred from the memory chip 38 to the micro processor 36 out from the card via control connector 42 to electrical connector 44 and on to the CPU 22.

A routine call code is then generated to establish a link with ISP 12 as a call request as in step 48 of FIG. 6. The call request then activates modem 34 to place a call to ISP 12. If the telephone number of ISP 12 is correct, a connection is established with ISP 12 and the login information from smart card 14 can then be transmitted to the ISP 12.

The ISP 12 verifies that the login name and password are registered with the ISP in order to determine whether the call request is from an authorized user of the ISP 12. This can be seen at step 50 wherein the ISP 12 connection is made and the user is connected to the ISP 12 at step 52, or alternatively, if the identification is not verified as a registered user's login and password, the call request is terminated and the program exits (as can be seen at step 54).

In some circumstances, however, the user may be in another country and may not wish to use the ISP 12 but instead wishes to use another ISP which is not set as the default ISP in database 28. In such an instance, the local telephone number for ISP 12 would not work, as there is a different country code and area code, or, alternatively, a different ISP telephone number.

In the situation where the user is in another country and wishes to use an ISP in the locale of the particular location in which he or she is in, the default connection to ISP 12 will not be established and the user will be at step 56 of FIG. 6. That is, the application program 26 will determine that the connection has not been established with ISP 12 and will generate a list of countries from the database to the user on monitor 32.

The user then selects from the monitor 32 by using a mouse (not shown), the country in which they are in (e.g., the USA), as can be seen at step 58 of FIG. 6. The application program 26 then receives the selected country from the user and accesses the database 28 to retrieve all of the locales which are in the particular country. The locales are displayed to the user in the monitor 32 (as at step 60 of FIG. 6). The user then selects the locale in which he or she is in at the particular time (i.e. such as Washington, D.C.).

The ISPs located within that particular locale are then displayed and the user selects a particular ISP from this list (as can be seen at stage 66 of FIG. 6). Another call request is then initiated as outlined above (this time for the new ISP) as can be seen by the loop 68 of FIG. 6. It is assumed that in such a situation, each ISP in a particular locale would have the same verification details of the smart card 14.

In another example of the invention, the smart card may not be used to select a new ISP, but may call the local ISP 12 (e.g., in Sydney, Australia when the user is in Washington, D.C.) by going through steps 46, 48, and then 56. Instead of the user accessing an ISP in the particular locale he or she is currently located in (as described above), the user could select a "direct connect" option which would request the user enter his or her current country location (e.g., USA) and locale (i.e., Washington, D.C.). The application will then determine the international dial-up connection number, the country number, and the area code of the country in which the ISP 12 is located (in this example, Sydney, Australia).

The information contained within the memory chip 38 may contain not only the user's login identification to the

US 6,792,464 B2

9

ISP 12, but may contain additional types of data, such as data to carry out a business transaction or data to automatically fill in particular information required on a form.

One example of such information which could automatically be updated on a form is information required by a bank for a personal loan. The smart card 14 could store data relating to the user's income, home address, whether the user's residence is owned or rented, the credit rating of the user and a summary of the spending habits relating to the user. The user would connect to the ISP 12 and connect to a web page of a bank. As the user connects to the bank's ISP 12, the user's information is automatically sent or uploaded to the bank via its ISP 12. The user would not have to fill out any forms via a keyboard, but could input upon interaction with the bank's web page how much he or she wished to loan from the bank. Alternatively, the bank could automatically calculate from the user's information which has been automatically uploaded to the bank the maximum amount of money that it is willing to loan the user. Such information could be displayed to the user from the bank's web page.

A particular advantage of the smart card 14 is that as the user's credit rating or spending habits change, the amount the bank is willing to lend him or her will also change. Therefore, the user could quickly determine how much credit is available to him or her at any particular time, without having to fill out forms (either hardcopy forms or via a web page).

It should be further appreciated that the smart card 14 described herein does not have to be a contact smart card, but may in fact be a contactless smart card wherein the user accesses the ISP 12 whenever the smart card 14 (which in this example would have an antenna embedded within it) is passed near the smart card reader 18.

In yet another example of the invention, the smart card reader and computer 24 may not be separate devices, but may in fact be combined into one piece of hardware so that the user can automatically access the ISP 12. Alternatively, it may be that the CPU 22, modem 34, and application program 26 are located within the smart card itself.

It should also be appreciated that the specific information contained on the data card may also relate to information other than the user's login and password for the ISP 12. The smart card may contain data specifying the network preferences of the user, such as the user's personal web page "book marks" and the specific Uniform Resource Locator (URL) of a particular web site or personalized web page which is accessed whenever the user initially connects to the ISP 12. For example, the issuer of the smart card 14 may be a bank and the ISP 12 could be owned and managed by the bank. The user would be automatically connected to the bank's home page whenever smart card 14 is inserted into smart card reader 18.

In another embodiment of the invention as shown in FIG. 7, the user is provided with online advertisement information that is specifically directed to the user's profile. The user's profile is determined from the personal identification information stored on the smart card 80. The identification information may include the user's name, address, sex, social security number, credit card number, age, and income. Against this individual user information is allocated a profile code sequence that identifies for each information field a profile identifier. For example, corresponding to the user's income will be a code for identifying a range of income that the user falls within. And, corresponding to the user's zip code will be an identifying code for identifying the region the user comes from.

10

A remote online advertising server 82 for serving up banner advertisements to the user's personal computer 84 will read the profile codes from the smart card 80 using the smart card reader 86 and will then serve to the user's computer advertisements that are targeted according to the user's profile. In this way, the user is provided with advertisement information that is specifically directed to the user's profile.

The above invention has been described with specific embodiments, but a person skilled in the art could introduce many variations on these embodiments without departing from the spirit of the disclosure or from the scope of the appended claims. The embodiments are presented for the purpose of illustration only and should not be read as limiting the invention or its application. Therefore, the claims should be interpreted commensurate with the spirit and scope of the invention.

What is claimed is:

1. A computer system for allowing a user to automatically access one of a plurality of network service providers which require information specific to the user and/or the network service provider to be accessed the computer system comprising:

a data card which contains the information specific to the user and/or the network service provider to be accessed;

a data card reader adapted to access at least part of the information contained on the data card when the data card is in communication therewith;

a data processor in communication with the data card reader and adapted to be connected to a network; and

an application program resident on the data processor, said application program being configured to automatically retrieve at least part of the information contained on the data card when the data card is in communication with said data card reader and to use said information to gain access to one of the plurality of network service providers via the network by using one of a default access number indicating a designated network service provider and a local access number from a database containing a list of access numbers or the plurality of network service providers along with corresponding location information for each access number in the list,

wherein said application program is immediately triggered upon insertion of said data card into said data card reader.

2. The computer system as set forth in claim 1, wherein said application program prompts the user to input at least one of a current area code and a current location for use in determining said local access number from said list.

3. The computer system as set forth in claim 1, wherein the user initially inputs said default access number for storage on said data card.

4. The computer system as set forth in claim 1, wherein upon initial use of said data card, the user is prompted to initiate said data card by inputting personal identification information into said data processor for encryption and storage on said data card.

5. The computer system as set forth in claim 1, wherein said data card comprises:

a microprocessor for processing the information contained on the data card;

a memory component for enabling the information to be stored within the data card; and

a communications interface for transferring he information from the data card to the data card reader.

US 6,792,464 B2

11

6. The computer system as set forth in claim 5, wherein said communications interface comprises a first antenna embedded inside said data card, and said data card reader comprises a second antenna embedded therein, for communicating the information between said data card and said data card reader.

7. The computer system as set forth in claim 5, wherein said communications interface comprises a contact connector, and said data card reader comprises a plurality of electrical connectors for relaying information to/from said data card when the contact connector and the plurality of electrical connectors are in physical contact.

8. The computer system as set forth in claim 1, wherein said information specific to the user and/or the network service provider includes user identification information, area information, and telephone number information.

9. The computer system as set forth in claim 1, wherein said database is stored on a memory means accessible by the data processor.

10. The computer system as set forth in claim 9, wherein said memory means is a compact disc read only memory.

11. The computer system as set forth in claim 1, wherein said database is stored in a remote server accessible by said data processor.

12. The computer system as set forth in claim 1, further comprising:

a remote server for serving advertisement information to the user based on profile information of the information specific to the user contained on the data card.

13. The computer system as set forth in claim 1, wherein said data processor is housed within said data card reader.

14. A method for allowing a user to automatically access one of a plurality of network service providers which require information specific to the user and/or the network service provider to be accessed, comprising the steps of:

configuring an application program resident on a data processor to automatically retrieve at least part of the information specific to the user and/or the network service provider to be accessed contained on a data card when said data card is in communication with a data card reader and to use said information to gain access to one of the plurality of network service providers via a network by using one of a default access number indicating a designated network service provider and a local access number from a database containing a list of access numbers for the plurality of network service providers along with corresponding location information for each access number in the list; and

immediately triggering said application program upon insertion of said data card into said data card reader.

12

15. The method as set forth in claim 14, further comprising the step of prompting the user to input at least one of a current area code and a current location for use in determining said local access number from said list.

16. The method as set forth in claim 14, further comprising the step of prompting the user to input said default access number for storage on said data card.

17. The method as set forth in claim 14, further comprising the step of prompting the user, upon initial use of said data card, to initiate said data card by inputting personal identification information into said data processor for encryption and storage on said data card.

18. The method as set forth in claim 14, further comprising the steps of:

processing the information contained on the data card;

storing the information in a memory within the data card; and

transferring the information from the data card to the data card reader.

19. The method as set forth in claim 18, further comprising the steps of:

communicating the information between said data card and said data card reader through a first antenna embedded inside said data card and a second antenna embedded inside said data card reader.

20. The method as set forth in claim 18, further comprising the steps of:

relaying the information to/from said data card when a contact connector of a communications interface of said data card and a plurality of electrical connectors of said data card reader are in physical contact.

21. The method as set forth in claim 14, wherein said information specific to the user and/or the network service provider includes user identification information, location information, and telephone number information.

22. The method as set forth in claim 14, further comprising the step of storing said database on a memory means accessible by the data processor.

23. The method as set forth in claim 22, further comprising the steps of providing said memory means as a compact disc read only memory.

24. The method as set forth in claim 14, further comprising the step of storing said database on a remote server accessible by said data processor.

25. The method as set forth in claim 14, further comprising the step of:

serving advertisement information to the use based on profile information of the information specific to the user contained on the data card.

*   *   *   *   *